No. 22,982.

SAM HAINES, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

MALICIOUS PROSECUTION—*Complaint Made on Advice of Prosecuting Attorney—What Information Should Be Given to Prosecuting Attorney*. In an action to recover damages for malicious prosecution, a complete defense is made by proving that the complaining witness obtained all the available information concerning the commission of a crime, except such as might have been acquired from the suspected person, and truthfully placed all that information in the hands of the deputy county attorney, and that the deputy county attorney advised and directed that the prosecution be commenced.

Appeal from Cowley district court; OLIVER P. FULLER, judge. Opinion filed February 12, 1921. Reversed.

Haines v. Railway Co.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*Alfred M. Jackson,* of Winfield, for the appellee.

The opinion of the court was delivered by

MARSHALL, J.: The plaintiff in an action for damages for malicious prosecution recovered judgment for $2,612, and the defendant appeals.

The plaintiff was arrested and placed in jail on the complaint of Minor Shaw, special agent of the defendant, charged with having stolen brass of the value of $25, the property of the defendant. A preliminary examination was held, but only by inference can it be deduced that the plaintiff was bound over for trial. The plaintiff alleged that the criminal prosecution was dismissed in the district court; other than that allegation, there is nothing to show the final disposition of that action.

In the present action, special questions were answered by the jury as follows:

"1. Did Minor Shaw, special agent of the defendant, ascertain and present the facts upon which the warrant was issued to Ed. J. Fleming, deputy county attorney, or did said deputy county attorney obtain the facts upon which he advised the prosecution from other sources? A. Yes, from Minor Shaw.

"2. Did Ed J. Fleming, deputy county attorney, and W. J. Gray know the facts and decide that a warrant ought to be issued before Minor Shaw knew of the alleged theft of brass? A. No.

"3. Did Minor Shaw sign and swear to the complaint involved in this case and upon which the plaintiff was arrested, at the instance on behalf of the railroad company or at the instance and upon the request of Ed J. Fleming, deputy county attorney? A. Yes, agent of the A. T. & Santa Fe.

"4. Did the plaintiff, Sam Haines, have in his possession at the time of his arrest a large quantity of broken brass which had been battered and from which any initials which have been upon it would not appear? A. Yes, defaced but unknown to jury who done this.

"5. Had Sam Haines, plaintiff, prior to the filing of the complaint in the justice court, told conflicting stories as to where he got the brass in his possession? A. No.

"6. Do you find that there was probable cause for believing that the plaintiff Sam Haines had stolen the brass in his possession from the A. T. & S. F. Ry. Co., at the time the complaint was filed? A. No.

"7. Did Ed J. Fleming, deputy county attorney, advise the said Minor Shaw, before he signed and swore to the complaint, that the evi-

dence which had been obtained by W. J. Gray and Minor Shaw was sufficient to justify the arrest of the plaintiff Sam Haines? A. Yes.

"8. Did the defendant A. T. & S. F. Ry. Co., or its employee acting under the authority of the company request or procure the issuing of the warrant upon which the plaintiff was arrested? A. Yes.

"9. If you find for the plaintiff do you find that Minor Shaw, special agent of the defendant, stated anything to Deputy County Attorney Fleming with reference to the information he had of the probable guilt of the plaintiff that was not true? A. No.

"10. If you find that Minor Shaw, special agent of the defendant, made any false statements to the deputy county attorney, or failed to state any facts known to him with reference to the probable cause of plaintiff's guilt, state specifically what fact or facts known to him were falsely stated or omitted by the said Minor Shaw? A. No."

## Among other instructions, the court gave the following:

"Under the law of this state the county attorney or his authorized deputy is the legally constituted officer to advise, bring and prosecute all actions for violations of the criminal laws of the state. And where a person having knowledge or information that a crime has been committed goes to the county attorney or his authorized deputy and in good faith states to such prosecuting officer all the facts known to him at the time, and all facts which could be learned by a diligent effort upon his part pertinent to such information, and after so stating such facts known, after having made a diligent effort to ascertain all the facts, follows and acts upon the advice of the county attorney, then he would not be liable in damages, even though the prosecution failed, or even though it might afterwards develop that there was not probable cause for the institution of such prosecution. But before a defendant can be exonerated from liability all the facts must be laid before the prosecuting officer, not only all which are known to the informant, but all which can be learned by a diligent and faithful effort to acquire pertinent information.

"If you find from the evidence that Minor Shaw was not acting for and on behalf of the defendant railroad company at the time he signed the complaint or that he was simply acting as an individual, or if you find that Minor Shaw or W. J. Gray, or he and Gray together, informed the county attorney of all the facts in relation to such alleged crime, and all the information which could be learned by them by diligent and faithful effort that was pertinent to the case, or if you find that the plaintiff was guilty of larceny of the goods in controversy, then the plaintiff cannot recover in this action."

## The principal argument by the defendant is that—

"All of the facts known to the prosecuting witness having been presented to the county attorney, and he having advised the prosecution, any presumption of malice or want of probable cause was completely rebutted."

This compels an examination of the answers by the jury to the special questions submitted, particularly questions 7 and 10, compels an examination of the instructions quoted, and of the rule declared in *Railroad Co. v. Brown,* 57 Kan. 785, 48 Pac. 31.

The answer to the 7th question shows that the county attorney advised Minor Shaw that the information submitted was sufficient to justify the arrest of the plaintiff. The answer to the 10th question shows that Minor Shaw did not make any false statement to the county attorney and stated to him all of the facts known by Minor Shaw with reference to the plaintiff's guilt. The answers to the special questions do not show that Minor Shaw made diligent effort to acquire information concerning the guilt of the plaintiff.

The plaintiff concedes that "the law is well settled that it is a good defense in such an action as this, if before the commencement of the prosecution, the complainant presented the matter to an attorney, fairly stating to him all the facts, and then in good faith followed the advice of the attorney." But he contends, "This law has no application to the facts in this case, because the complaining witness did not state all the facts to the attorney, nor did he state facts which he could have obtained by even a very superficial investigation."

The plaintiff relies on the rule declared in *Railroad Co. v. Brown,* 57 Kan. 785, 48 Pac. 31, where this language was used:

"The advice of legal counsel, as to the institution of a criminal proceeding, sought and acted upon in good faith, will absolve one 'from damages for malicious prosecution; but only where all the facts known to the informant, and all which can be learned by a diligent effort to acquire information, have been laid before such counsel." (Syl. ¶ 3.)

This rule was restated in *Drake v. Vickery,* 81 Kan. 519, 106 Pac. 290.

In *Dolbe v. Norton,* 22 Kan. 101, this language is found:

"Where a person, acting in good faith, and under the advice of counsel learned in the law, mistakenly institutes a prosecution against another person who is not liable, and the prosecution fails, the prosecutor does not thereby render himself liable to an action for malicious prosecution, or to any other action." (p. 105.)

In *Shippel v. Norton,* 38 Kan. 567, 16 Pac. 804, this court said:

"It is a good defense to an action for malicious prosecution, that the defendant, before commencing the alleged malicious prosecution, it being a criminal prosecution, presented the matter to the county attorney, fairly stating to him all the facts, and then in good faith followed the advice of the county attorney." (Syl. ¶ 1.)

It must be noted that in the two cases last cited, nothing was said about information that might have been acquired by diligent effort.

An exhaustive note on "Advice of counsel as defense to an action for malicious prosecution" is found in 18 L. R. A., n. s., 49-74. From this note, we learn that there are three conflicting rules followed in different jurisdictions, involving the advice of counsel as a defense in actions for malicious prosecution. One rule is that—

"Advice of counsel, to be available as a defense in an action for malicious prosecution, must have been given on a full and fair statement by the prosecutor of all the facts known to him, or which by proper diligence he could have ascertained." (p. 60.)

Another rule is stated as follows:

"It has been held in several jurisdictions that the defense of advice of counsel is available, in an action for malicious prosecution, to one who disclosed to counsel all the facts within his knowledge, although he did not disclose all the material facts bearing on the case, which he could have ascertained by reasonable diligence." (p. 61.)

Still another—

"The rule that advice of counsel, properly taken and relied upon in good faith, is a defense to a suit for malicious prosecution, applies with still greater reason when the proceeding complained of was instituted with the approval of the prosecuting officer of the state." (p. 71.)

The first of these three rules is supported by the largest number of decided cases, but each of the other two is sustained by ample authority. All have been examined.

It may be safely said that one who seeks to have another prosecuted for a criminal offense must truthfully give to the county attorney all the information in his possession. Thus far there is no question. We come now to the consideration of the expression, "diligent effort to acquire information." One desiring to procure the arrest of another, should make honest, faithful, and reasonable effort to ascertain all the facts concerning the matter, and should not be excused from liability in an action for malicious prosecution if he does not make

such effort. That is as far as the rule declared in *Railroad Co.*
*v. Brown* and *Drake v. Vickery* should go. This will explain
such differences as there may be between these cases and *Dolbe*
*v. Norton* and *Schippel v. Norton.* In nearly all the cases
cited in the note in 18 L. R. A., n. s., 60, on the question of dili-
gence to ascertain the evidence, the language is in substance
that reasonable effort must be made, not as stated in *Railroad*
*Co. v. Brown,* "diligent effort," although the two expressions
probably mean the same. One suspected of crime should not
be arrested for and charged with its commission unless rea-
sonable effort has been made to ascertain all the facts con-
nected therewith, but when that effort has been made and the
facts learned have been submitted to a county attorney, who,
in this state, generally determines whether or not a prosecu-
tion shall be commenced, and who then advises and directs
that the action be commenced, the person giving the informa-
tion should not be held liable in an action for malicious prose-
cution, although he does not make any inquiry of the person
suspected.

The rule requiring reasonable effort to ascertain the truth,
does not require that the man suspected of having committed
the crime be questioned concerning it. If such inquiry were
necessary in order to avoid the results of a failure of a crimi-
nal action and the consequent action for malicious prosecution,
but few criminals would be brought to justice. The warning
that would necessarily be thus given to the man suspected,
would, if he were guilty and of a criminal disposition, generally
result in his immediate flight. Men standing high in their
communities commit crimes, and are often gone when it is
learned that they have committed them, and sometimes are
never apprehended or brought to trial.

It is necessary to carefully examine the evidence in the
present case, not for the purpose of weighing it, but to ascer-
tain whether judgment was properly rendered for the plain-
tiff on that evidence and the findings of the jury. The abstract
shows that Ed J. Fleming, the deputy county attorney, to
whom W. J. Gray, a constable in Arkansas City, and Minor
Shaw, Santa Fe special agent, submitted the information in
their possession before the complaint was signed, testified as
follows:

"I remember the circumstance of this prosecution involved in this case. The first information I had in regard to this was one Sunday, W. J. Gray, about noon, called me on the phone; I was at home, he was somewhere else, I don't remember where now, and he told me that he had been down to the Henry Baron hide house, run by a man by the name of Huffman, got a colored boy who had stolen some tools; he plead guilty; while he was there Mr. Huffman told him there had been a man there trying to sell railroad brass, stolen brasses, didn't know his name, but he had driven up in a one-horse buggy with the brasses in the back of the buggy—quite a large quantity, 150 pounds; that he refused to buy them; he stated that Mr. Gray ought to investigate; he said he told him he would. I remember he stated that that had been Saturday night that he had been to Henry Baron's hide house; he said Mr. Huffman told him that the man who was trying to sell the brass had stated he could sell them to Earl Stanley's hide house on Sixth street, and that he guessed he would go there. He said he found out from Mr. Shaw that the Santa Fe had been missing some brasses especially when the circus was here. He went to Mr. Stanley's and he stated that the old gentleman Stanley was running the place of business when the man drove up with a buggy of this kind with about 150 pounds of brass in the buggy; he refused to buy them on account of it being railroad brass, said it was stolen and he wouldn't handle them; that the man had claimed that they, as I recall, were from the standard derricks or rigs that was drilling north of town, Arkansas City, was brasses from there, and that he could give evidence and papers, bill of sale to it, it was all right. He said no, he knew railroad brass and wouldn't handle it under any circumstances, that he didn't know the man's name but Fred Bly was there and Bly knew him. Mr. Gray talked to Bly and he said he was Mr. Haines. That is what Mr. Gray told me when he first called. He asked Fred and he told him practically the same thing that the old gentleman Stanley did; that he had the brasses and was trying to sell them, and they refused to buy them. I said, well, you had better call Judge McIntyre up, have him come to the office, he can draw a complaint as well as I can under the circumstances. Tell him it will be all right to draw the complaint, you can make it, charging Haines with stealing brasses. I asked him about the value of it, he told me that they was paying about 18 to 20 cents a pound for old brass of that kind; I told him to have McIntire draw the complaint and get a warrant and arrest him; he said, I don't like to make the complaint where I am going to serve the papers, he says, Mr. Shaw is here, why can't he make it? I said, he can if he will; he says, wait a minute. In a little bit he says Mr. Shaw wants to talk to you. I said all right. He said, Hello, I said Hello; he says, Billy Gray says you want me to make a complaint but I don't want to make it if it will get the company in trouble. I says, I don't know, I think under the circumstances of Mr. Gray's statement, I think you have plenty of evidence to justify an arrest and a trial of this case. He said he didn't know whether it was the Santa Fe's brass or not, Mr. Gray had not seen it, and the men he talked to didn't know

whether it was Santa Fe brass or not, or what railroad's brass it was. I said, if the Santa Fe has lost brass lately and this is railroad brass that is sufficient to make a complaint. He said, Well, I wasn't down to Henry Baron's hide house, I was only to one. I said, didn't Mr. Gray talk to you just now and did he tell you what he told me over the phone. He said yes. I said that is just as good as going down there, him telling you. He said, All right, I will go over to the office of the justice of the peace, in a little bit the justice of the peace, I called up Mr. McEntire. I told him to make a complaint. Mr. Gray had told me that the Santa Fe had lost brass. Mr. Gray told me that Fred Bly said it was Sam Haines who had that brass. I knew when I made this order and passed on the matter that it was Sam Haines. I had known Sam Haines after I came to Arkansas City, I guess while I was going to school there, since I was a little boy. I knew all about his general reputation. It was considered good. I knew when I advised them to commence the prosecution exactly what the reputation of Mr. Haines was, that is, I knew it as well as I do now. I never heard it questioned in any way; I knew him very well. He was a personal friend of mine and I liked him. I don't know as it would have changed me any if Minor Shaw had told me he was a man of good reputation, I always understood that he was a man of good reputation. . . .

"Mr. Shaw nor the Santa Fe Company at any time requested me to issue a warrant in this case. They didn't make application to me other than what I have testified to in regard to that."

The abstract shows that John Stanley testified:

"I live at Arkansas City. . . . My business . . . was in the junk and hide business and we bought fur and everything that way. I know Sam Haines, plaintiff in this case, now. I didn't know him at that time. I remember of his coming to my place along just a little before the 6th of May, somewhere along there, I can't swear to the date. He had a one-horse buggy having an opening behind like. He had some brass or iron there. I have seen something like that brass (indicating brass offered in evidence). I couldn't tell how much he did have in there. I should judge one hundred pounds or one hundred and fifty. It was broken up like that. I examined it. It was just piled in the back of the buggy. I believe there were gunny-sacks over it, wouldn't say for certain. He called me out to look at it, wanted to sell it to me. He said he got it at the refinery, the Milliken—or the Empire. He didn't tell me how he got it. I told him I couldn't buy that brass, that it was railroad brass; he said he could get me papers to show he bought it from the refinery; I told him there wouldn't be any need of that, I couldn't handle it no way. I knew what it was. I told him we 'dassent' handle railroad brass if we knew it; I told him it was railroad brass. He went from my place to Huffman's, his buggy was broke."

The abstract shows that W. J. Gray testified in part as follows:

"I am constable . . . I know Minor Shaw. . . . First intimation I got of any brass I had been down to Henry Baron's hide house to look after some stolen tools . . . I was telling this man, I forget his name, if he saw any brass or tools of any kind to notify me at once that I wanted to see them before he disposed of them. One evening, or one morning, I am not positive, he called me up and said there was a fellow there wanted to sell some brass; . . . I went down to find out something; when I got there . . . he said . . . there was a man there with brass and wanted to sell it. . ... I asked him if he saw the stuff and he said yes, he looked at it and it looked like railroad brass to him. . . . I didn't know of any brass that had been stolen so I called up Minor Shaw, special agent, and told him to come up, asked him if the Santa Fe had lost any brass down at the shops. He said they had. I told him there had been a man at Baron's hide house trying to sell brass, if any brass was stolen that it might be some of the brass. I asked this man at the hide house if he knew this fellow, he said he didn't, said he drove down the alley back of his house and tied his horse about fifty yards from the hide house and walked down to the building and asked this man if he wanted to buy brass; he told him he didn't know whether he did nor not; said this man told him to come to the buggy and tell him what he would give. He went up and looked at it and said it was Santa Fe brass, said he didn't want to buy it, said he thought it was stolen. I asked him if he knew which way the fellow went; he said he told him he was going to Stanley's junk yard, thought he had gone to sell it there. I talked to Mr. Shaw, I said, we had better go to Stanley's, probably he was up there. . . . We went up and talked with the old gentleman, Stanley, asked him if there had been anybody trying to sell brass, he said they had, and described the rig he had it in, had it in an old buggy. . . . I asked him if he knew who it was, he said no. Said Mr. Bly knew him. I asked Mr. Bly who it was and he said it was Mr. Haines. . . . I think Mr. Stanley told me that he got it from some oil rig or something. I called up Mr. Fleming then, the deputy county attorney. He was deputy county attorney at that time. I told him what we found, in fact we knew it was railroad brass taken by somebody; he wanted to know who was in possession of it, we told him. Mr. Fleming says if you think it is railroad brass and that it has been stolen we will get out a warrant."

On cross-examination, Gray stated that he was satisfied that the brass was stolen, but that he was not satisfied that the plaintiff stole it. It does not appear that this doubt on the part of Gray was communicated to Minor Shaw or to the deputy county attorney, nor that Minor Shaw entertained any such doubt.

The plaintiff testified as a witness in his own behalf on the trial of the present action, and contradicted the testimony of the witness Stanley, the junk man, in material matters. The

plaintiff testified that he found the brass in a pasture wrapped in decayed gunny sacks; that he took it to the junk men in Arkansas City to find out what it was; that he there ascertained that it had value; and that he did not offer to sell it to either of them.   Even if the plaintiff's testimony were true, it cannot control the information in possession of Minor Shaw in determining the question of probable cause.   W. J. Gray and Minor Shaw had the story of the junk men concerning what the plaintiff told them about how he came into the possession of the brass, and that is the only story that can properly be considered in determining the question of probable cause in this action.   The testimony set out shows that all the information obtainable, except what might possibly have been received from the plaintiff and that concerning his good reputation, was submitted to the county attorney before the complaint was signed.   It was not necessary that Gray and Shaw, or either of them, should go to the plaintiff and ask him concerning the brass.

Nothing was said to the deputy county attorney about the good reputation of the plaintiff, but the deputy knew all about that matter and was well informed concerning it.   Under those circumstances, want of probable cause was not established by failing to inquire concerning the plaintiff's reputation or by failing to inform the deputy about it.

In *Clark v. Baldwin,* 25 Kan. 120, the question of the good reputation of the person accused of crime was an important factor, but there was a sharp dispute concerning what the complaining witness had learned about the party arrested.   The complaining witness had reported to his counsel that the party accused of committing the crime was a person who would probably commit the crime with which he was charged, that of falsely representing himself to be another person to obtain a package of money from an express office.   One of the witnesses from whom the complaining witness claimed to have obtained his information was put on the stand and contradicted the complaining witness about what had been said to him.

In *Railroad Co. v. Brown,* 57 Kan. 785, 48 Pac. 31, the jury found that the complaining witness "failed to make proper investigation respecting Brown's reputation in the neighbor-

hood, and his connection with the case," but the judgment was reversed on another ground wholly unconnected with the reputation of Brown or with the extent of the investigation made by the prosecuting witness.

In *Drake v. Vickery*, 81 Kan. 519, 106 Pac. 290, where the rule of *Railroad Co. v. Brown*, supra, was reiterated, the complaining witness had not placed all the facts within his knowledge before his counsel or before the county attorney. It was therefore unnecessary to say anything about diligent effort being made to learn all the facts. The decision of the question now before the court was not necessary in reaching a correct conclusion in any one of these three cases.

The instructions requiring Shaw to exercise diligent and faithful effort to acquire pertinent information were misleading. The evidence showed that all available information was obtained except what could have been acquired from the plaintiff. The findings of the jury showed that all information had been truthfully given to the deputy county attorney and none had been withheld. The evidence showed that on the information submitted, the deputy county attorney not only advised, but directed that the criminal prosecution be commenced. It was not commenced without probable cause.

The judgment is reversed, and judgment is entered for the defendant.

DAWSON, J. (concurring) : In times past, the initiative in criminal prosecutions was usually undertaken by some private citizen as complaining witness, and the rigor of the rule imposing liability on him for causing arrest without probable cause, etc., grew out of that mode of administering justice under criminal law. In our time, criminal proceedings are so largely under the control of official public prosecutors (*Foley v. Ham*, 102 Kan. 66, 169 Pac. 183) that the old rule as to the liability of the prosecuting witness does not fit into the circumstances where a prosecution is undertaken with the sanction of the county attorney or under his direction. In such cases, I think the correct rule is the third of those quoted above by Mr. Justice Marshall, and I would hold that where the complaining witness has truthfully laid before the county attorney all the facts of which he has knowledge and the county attorney directs that a prosecution be instituted pur-

Haines v. Railway Co.

suant thereto, the complaining witness is not liable for damages although such prosecution should fail for want of probable cause or for any other reason.

BURCH, J. (concurring) : In the case of *Schippel v. Norton*, 38 Kan. 567, 16 Pac. 804, special findings of fact on which judgment was entered for the defendant read as follows:

"12. Before making and verifying said complaint, did defendant make a statement of the facts of the case, as then known by him, to the county attorney, John G. Spivey?  A.  Yes.

"13. Was such statement substantially full and correct?  A.  Yes.

"17. Did the county attorney, upon being informed of the facts as then understood by Mr. Schippel, advise Mr. Schippel that John I. Norton, Wright Norton and Alonzo Wagstaff were guilty of a criminal trespass, and liable to such prosecution as was instituted against them? A.  Yes."  (pp. 568, 569.)

In the opinion the court said:

"We think it is a good defense to an action for malicious prosecution, that the defendant, before commencing the alleged malicious prosecution, it being a criminal prosecution, presented the matter to the county attorney, fairly stating to him all the facts, and then in good faith followed the advice of the county attorney.  Such a thing completely rebuts the allegation of the plaintiff that there was a want of probable cause for commencing the prosecution, and it of itself shows probable cause."  (p. 570.)

Authorities were cited in support of this declaration of principle.  Among them was the case of *Laughlin v. Clawson*, 27 Pa. St. 328.  A portion of the opinion reads:

"If the officers of the state, who are appointed on account of their legal learning, consider that a given state of facts is sufficient evidence of probable cause, how can the private citizen be said to be in fault in acting upon such facts, and how can the state condemn him to damages for so doing?  To decide so is to use the machinery of government as a trap to ensnare those who trust in government for such matters, and who ought to trust in it.  If such officers make a mistake, it is an error of government itself, and government cannot allow the citizen to suffer for his trust in its proper functionaries."  (p. 330.)

It may be that in the Schippel case, the facts as known to Schippel when he presented them to the county attorney were all the facts.  In the Pennsylvania case, the question of the extent of the informant's inquiry was not an issue.  It is fair to assume, however, that the statement of principle in the Schippel case was based on the findings of fact.  The Pennsylvania

case was pat authority for the statement so interpreted, and the result is, the Schippel case very nearly committed this court, after careful consideration of the subject, to the doctrine that advice of the state's law officer on a given set of facts will protect a prosecuting witness, whether or not he might, by searching, have found out more.

The Schippel case was decided in 1888. In 1897, the case of *Railroad Co. v. Brown*, 57 Kan. 785, 48 Pac. 31, was decided, and for the first time the addition, "diligent effort to acquire information," was inserted. The decision was expressly rested on another ground, and discussion of the addition was entirely *obiter*. The only authority cited for the addition was the case of *Clark v. Baldwin*, 25 Kan. 120. In that case the sole question was whether or not the prosecuting witness fully and fairly stated to counsel what information he had. In the brief for Baldwin occurs the following:

"Legal advice to be available as a defense in a case like this must have been given after a full and fair statement of all the facts of which the prosecutor had knowledge, or that he might have ascertained by reasonable diligence . . ." (*Clark v. Baldwin*, 25 Kan. 120, 125.)

The court, however, did not mention the subject, and so the citation in the Brown case is to a brief, and not to an opinion of the court.

In 1910, the case of *Drake v. Vickery*, 81 Kan. 519, 106 Pac. 290, was decided. In the opinion it was said advice of counsel will absolve only where all the facts known to the informant, and all which he could learn by diligent effort, are laid before counsel, and the Brown case was cited as authority. No question of effort or lack of effort to ascertain facts in addition to those disclosed to counsel, was involved. Vickery was a landlord who had trouble with his tenant, Drake. Vickery presented to counsel the terms of the lease. He did not present to counsel an oral modification of the lease, which Drake proved in the action for malicious prosecution.

The result is, there is no authoritative declaration of this court approving the "diligent-effort" doctrine. Leaving the Schippel case entirely at one side, and considering the subject from the standpoint of principle, I favor the third rule stated by Mr. Justice Marshall. I regard the quotation already made from the Pennsylvania case as pertinent, and I

regard the following quotation from an opinion of the supreme court of Wisconsin as entirely sound:

"The real basis for the doctrine that the advice of counsel under the circumstances stated stands for probable cause is that it covers the subject of whether the statement made is sufficient without further investigation as to the facts. Counsel is supposed to pass upon that question, and his advice honestly given and honestly acted upon to preclude any successful claims of negligence or imprudence on the part of the prosecutor. . . ." (*King v. Apple River Power Co.*, 131 Wis. 575, 583.)

MASON, J., and PORTER, J., concur with Justice Burch.