OLIVER W. STEADMAN, Appellant

(Defendant below),

v.

Art T. TOPHAM, Appellee

(Plaintiff below).

No. 2858.

Supreme Court of Wyoming.

April 28, 1959.

338 Pac.2d 820

64

Meyer Rankin, Cody, and Edward E. Murane, Casper, for appellant.

68

Goppert & Fitzstephens, J. D. Fitzstephens, Cody, for appellee.

Before BLUME, C. J., and PARKER and HARNS-BERGER, JJ.

OPINION.

Mr. Chief Justice BLUME delivered the opinion of the court.

This is an action for malicious prosecution brought by Art T. Topham, hereafter referred to as plaintiff or by his name, against the Shoshone National Bank of Cody and Oliver W. Steadman, an attorney at law of Cody, Wyoming. The Shoshone Bank will hereafter be referred to as the bank and Mr. Steadman will be referred to either by name or as the defendant. The petition alleged that the defendants maliciously and without probable cause filed a criminal complaint in the justice court at Cody signed and sworn to on December 19, 1955, by Oliver W. Steadman, reading as follows:

"I, Oliver W. Steadman, do solemnly swear that on or about the 9th [8th] day of January, 1955, in the County of Park and State of Wyoming, the said Art T. Topham did unlawfully know that a

statement in writing to the Shoshone National Bank, Cody, Wyoming, a Corporation had been made respecting the financial condition of the A & N Surplus, Inc., a Corporation, the said Art T. Topham being then and there an officer and having interest in said Corporation, and did procure a loan upon the face thereof, from said Shoshone National Bank, Cody, Wyoming, a Corporation, for the benefit of said A & N Surplus, Inc., a Corporation.

"Contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Wyoming."

The defendants answered, denying that they instituted criminal proceedings against the plaintiff maliciously or without probable cause. Steadman admitted that he executed and filed the foregoing criminal complaint and alleged that he, believing that a criminal offense had been committed by Art T. Topham, reported the matter of the alleged criminal offense on the part of Topham to the County and Prosecuting Attorney of Park County, Wyoming, who thereupon caused to be prepared and filed the criminal complaint mentioned by Topham in his petition. An arrest of Topham was made pursuant to the criminal complaint on December 24. He furnished bail in the sum of $200 and was never imprisoned.

The case was tried to a jury. At the end of the evidence produced on the part of Topham and again after all the evidence was in, the defendants in the case made motions to have judgment entered in their favor which were overruled. But before the case was submitted to the jury the case against the Shoshone National Bank was dismissed and the case was submitted to the jury only as to Steadman. The jury returned a verdict

against Steadman for the sum of $10,000 damages in favor of Topham. Thereafter Steadman filed a motion for a judgment notwithstanding the verdict or, as an alternative, for new trial. The court directed that Topham should file a remittitur of all damages in excess of $4,000 or that a new trial would be granted. The remittitur was filed and thereafter a judgment was entered against the defendant for the sum of $4,000 in favor of Topham and against Steadman. Thereafter supplemental motions for a new trial were filed by Steadman in the case. Attached, among other things, were affidavits by N. G. Catellier and E. M. Casey to show that, as a matter of fact, Topham knew of the financial statement mentioned in the complaint filed herein and to show that plaintiff Topham testified falsely in the case. Catellier stated in his affidavit that Topham was familiar with the financial statement and had seen it and helped to prepare it, and that Topham was specifically asked in the bank at the time the loan for $800 was obtained as to whether or not the financial statement was correct and that Topham answered in the affirmative. The affidavit of E. M. Casey stated that Topham and Catellier attempted to get him to help them get a loan in January 1955 and that at that time:

"Topham and Catellier had with them a financial statement showing the financial condition of the A & N Surplus, Inc., and this financial statement was discussed briefly with Mr. Topham and Mr. Catellier;

\*    \*    \*    \*    \*    \*

"I do know of my own personal knowledge that Art T. Topham was familiar with the financial statement of the company in January, 1956 [1955] because he and Mr. Catellier were present

in my office in Powell and they had the financial statement with them and if Mr. Topham wanted to he had full opportunity to study the financial statement at that time."

But these supplemental motions were overruled, and the case is now before us on appeal taken by Oliver W. Steadman.

The facts leading up to the filing of the criminal complaint above mentioned are briefly as follows: Topham and Catellier were the holders or main holders of the stock of the A & N Surplus, Inc., a corporation. They wanted to procure a loan from E. M. Casey above mentioned. Not having procured that loan, they wanted to procure one from the Shoshone National Bank. A financial statement was executed on January 8, 1955, sworn to on January 9, 1955, showing on hand merchandise valued at $18,723.42 and but little indebtedness. It did not include any indebtedness of $5,000 mentioned hereafter. The financial statement was signed by Catellier but not by Topham. On January 22, 1955, the corporation passed a resolution to permit the borrowing of $3,500 from the foregoing bank. The signatures attached were those of Topham and Catellier. The financial statement was given to the bank, the exact date of which does not appear in the record. Both Topham and Catellier went to the bank on January 27, 1955, after the financial statement had been given to the bank and procured a loan of $800, the note being signed by both on behalf of the corporation. The note fell due in three months, and the president of the bank then attempted to procure a renewal on the note, but Catellier by that time had apparently severed his connection with the A & N Surplus, Inc., and the renewal note was only signed by Topham. The old note was retained and together with

the financial statement was placed in the hands of the defendant Steadman for collection, and a judgment was obtained thereon on November 30, 1955. On December 16, 1955, while Steadman was trying to discover as to whether or not Topham had any property on which to make a levy, he discovered that Topham and Catellier had executed a mortgage, mortgaging all of the property of the A & N Surplus, Inc., the mortgage being dated December 20, 1954, and acknowledged January 20, 1955, and filed of record in Park County on January 21, 1955. Steadman at that time, namely, on December 16, 1955, called at the office of the County and Prosecuting Attorney of Park County, Wyoming, and laid the matter before him, including the mortgage above mentioned, the financial statement, the note given the bank, and the judgment secured on the note. The county and prosecuting attorney did not at that time act upon the information given him by Steadman but took the matter under advisement for three days, in the meantime discussing the matter with his deputy, and on December 19, 1955, he called Steadman and advised him that in his judgment a crime had been committed and that he had prepared a criminal complaint ready for Steadman's signature. The complaint was then signed by Steadman as above mentioned. An amended complaint was filed at the request of the county and prosecuting attorney on January 9, 1956, but no arrest was made under that complaint, so that it is immaterial in the case and need not be mentioned again. Baird v. Aluminum Seal Company, Inc., 3 Cir., 250 F.2d 595; Perry v. Arsham, 101 Ohio App. 285, 136 N.E.2d 141.

We might state at this place that in the trial of the case Topham proved actual damages in approximately the sum of $400 by reason of making two or three

trips to Cody in connection with the criminal complaint and paying the sum of $100 to his attorney, and he also testified that he was humiliated and shunned by some of his friends.

The case under the criminal complaint before the justice of the peace was continued several times, and on January 27, 1956, the case was dismissed by the county and prosecuting attorney.

1. The plaintiff Topham was required to prove in this case not only that the case was dismissed against him but also that Steadman acted with malice and without probable cause in filing the criminal complaint heretofore mentioned. Henning v. Miller, 44 Wyo. 114, 8 P.2d 825, 14 P.2d 437. We shall hereafter discuss the case mainly in connection with the question as to whether or not there was probable cause for Steadman to file his complaint against plaintiff Topham. The trial court in that connection in Instruction 5 told the jury in part as follows:

"You are instructed that the Court has found in this case that there was want of probable cause, as a matter of law; and you may infer from this that there was malice on the part of the defendant Steadman."

Counsel for Steadman contend that this instruction was erroneous.

2. We held in the case of McIntosh v. Wales, 21 Wyo. 397, 134 P. 274, Ann.Cas.1916C, 273, that a dismissal of the proceedings at the request of the prosecuting attorney constitutes no evidence of want of probable cause since he acts in his official capacity and not as a representative of the defendant. It is argued

by counsel for the plaintiff Topham that this case should be distinguished from the foregoing case by reason of the fact that the dismissal herein was entered after the justice of the peace found that no probable cause existed for arresting Catellier, against whom also an information had been filed. We do not think this fact makes any difference. We do not know what evidence was introduced in the Catellier case. At least Steadman, who should have been the main witness, was never summoned or asked to testify in the case, nor was he asked to testify in the case filed against the plaintiff Topham. The testimony shows that there were negotiations between Steadman and the attorney for the plaintiff to settle the judgment against the plaintiff. The judgment was in fact settled by the plaintiff paying to the bank one-half of the judgment against him. This was about nine o'clock in the morning on January 27, 1956. Thereafter, at about ten o'clock or a little later, the criminal complaint was dismissed by the county and prosecuting attorney without the presence of Steadman.

3. We shall then proceed to consider the facts and incidents in connection with the making of the loan of $800 by the bank. As may be noted below, the evidence of the plaintiff in this connection was mainly to the effect that the charge against him was not true, apparently on the theory that this would show want of probable cause. All the testimony was admitted without objection so that we need not inquire as to its relevancy. See on that matter 54 C.J.S. Malicious Prosecution § 89g, pp. 1068-1069. The question of probable cause is not dependent on the guilt or innocence of the plaintiff. These are two different questions. 54 C.J.S. Malicious Prosecution § 27, p. 986.

Hence, we shall first examine the evidence which counsel for plaintiff believe shows the innocence of the plaintiff and thereafter proceed to discuss the evidence as to probable cause.

a. The uncontroverted evidence in the case is that at the time the loan was made the officials of the bank had before them the financial statement of January 8, 1955, above mentioned, and the only reasonable inference to be drawn is that as a matter of fact the bank in making the loan relied upon that financial statement. So the only question left before us is as to whether or not Topham had knowledge of it. The plaintiff testified that he had no knowledge whatever of the financial statement which was prepared by Catellier or whether it was handed over to the bank. Perhaps the court finding as it did that there was lack of probable cause as a matter of law credited the testimony of the plaintiff. Ordinarily, of course, a judgment or verdict will not be disturbed where the evidence is conflicting. However, the rule has its limitations. In the case of Montgomery Ward & Co. v. Arbogast, 53 Wyo. 275, 81 P.2d 885, 892, we approved the following rule:

" 'This rule [the one relating to conflicting evidence], however, does not relieve an appellate court of its duty of analyzing the evidence in the light of reason and human experience and giving consideration to the motives and propensities which tend to influence or prompt human action, in an effort to solve the question as to whether the judgment is reasonably and substantially sustained by the evidence. * * *'

" 'There must be more than a conflict of mere words to constitute a conflict of evidence. The contrary evidence must be of a substantial char-

acter, such as reasonably supports the judgment as applied to the peculiar facts of the case.' [Herbert v. Lankershim, 9 Cal.2d 409, 71 P.2d 220, 251.]"

So we must analyze the facts shown in the record before us, particularly in view of the fact that actions for malicious prosecution are not favored. Penton v. Canning, 57 Wyo. 390, 118 P.2d 1002, 138 A.L.R. 300.

Plaintiff, in order to explain the mortgage in evidence in this case, testified that the mortgage indebtedness was that of Catellier, that Catellier borrowed $5,000 from Krantz which went into the business of A & N Surplus, Inc., that he and Catellier both signed a note for that amount on December 20, 1954, and that the mortgage was not signed or acknowledged until January 20, 1955. However, the fact that it was not acknowledged until the later date is not very important. It is not at all unusual that an instrument is actually executed on one date and acknowledged later. When actually executed it is good between the parties thought not acknowledged. Reynolds v. Morton, 22 Wyo. 174, 136 P. 795. Counsel for plaintiff say that the $5,000 was not a corporation indebtedness and therefore would not appear on the financial statement given to the bank, but if it was not a corporation indebtedness, why and how did the plaintiff and Catellier undertake individually to mortgage property belonging to a corporation? That fact has not been explained and seems to throw a dark shadow across the case.

The evidence shows that the plaintiff owned 80 to 85 percent of the corporation and that he was president thereof. It would perhaps be not unreasonable, under these facts, to presume that he had full knowledge

of the financial statement above mentioned until the contrary were satisfactorily proven. Topham's testimony was that Catellier told him that he had prepared a financial statement but that he did not know that it was presented to the bank. He testified further in relation to the resolution of the corporation as to borrowing money from the bank and his testimony was as follows:

"Q. And at that time was the board advised that a financial statement had previously been given to the bank by the secretary of the corporation? A. No.

"Q. You weren't advised of that? A. I wasn't advised; I am on the board.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Q. I am asking you whether or not the Board authorized the secretary to give a financial statement to the bank? A. He had that. It was agreed upon long before that there was.

"Q. That is normal procedure? A. Normal procedure as far as I was concerned. I'm not familiar with corporate laws.

"Q. Irrespective of the meeting, isn't it customary in your own business experience, if you were getting a loan from a loaning institution or bank, you give a financial statement; hasn't that been your experience? A. Any business loan; yes.

"Q. This was in business; you were getting a business loan? A. Understand this was Mr. Catellier. He was supposed to handle the note. He had authorization to make arrangements for a loan.

"Q. Were those authorizations Mr. Catellier (sic), if the bank requested a financial statement, it would have been in line with the authority he had? A. Yes, it would be his duty."

And yet in spite of this fact he attempted to make the court believe the improbable fact that he knew nothing of a financial statement. He further testified:

"Q. At the time of signing this document [the note to the bank], did you have any conversation with either—any of the officials of the bank? A. I believe we passed the pleasantries of the day, that is about all.

\*      \*      \*      \*      \*      \*

"Q. And you are positive, on your oath, that there was no discussion, about a financial statement, on the 27th of January, 1955? A. I am positive sir. All I done was sign the note."

It would seem that in view of the fact that nothing was said in the bank about security for the loan, something must have been done or said in reference thereto prior to that time. To say that plaintiff, though the main owner of the A & N Surplus, Inc., did not bother to find out does not appear to be credible. That was the impression of the county and prosecuting attorney, a disinterested party, who, after examining the documents given him by Steadman, stated, "it was certainly reasonable to believe that Mr. Topham knew of that statement [the financial statement]." As heretofore stated, a few days before the loan from the bank was made, plaintiff and Catellier transferred the property of the corporation to Kranz by mortgage which was foreclosed shortly afterwards and, accordingly, little or nothing was left in the

hands of the plaintiff and Catellier with which to pay the bank. The financial statement did not mention the mortgage or any indebtedness of $5,000. Topham stated several times in his testimony that he did not mention the mortgage when the loan of $800 was obtained, and at one time stated that he was not asked. Yet it would seem to be clear that common decency and ordinary honesty on his part would have required him to inform the bank that all the property of the corporation was mortgaged to Kranz. It was his duty to speak, and the failure to do so was a fraud upon the bank, and for this court to say that under the facts of this case plaintiff was nevertheless entitled to recover damages would, we think, be putting a premium on dishonesty. Fraud may be perpetrated by silence as well as by representations and the former is at times the equivalent of the latter. 37 C.J.S. Fraud §§ 15 and 16, pp. 242-245. Topham's evidence under the circumstances herein, that he knew nothing about the financial statement, was, in the words of Montgomery Ward & Co. v. Arbogast, supra, merely a matter of words and not of substance. The person who knew all about it was Catellier. He could not be expected to be subpoenaed as a witness by the defendant because presumably he was a hostile witness, but we can see no reason why the plaintiff could not have subpoenaed him and confirmed his statement in connection with his ignorance in regard to the financial statement, if actually true. But he did not do so.

In closing this phase of the case, we think that there are distinct indications in the record that the plaintiff was actually guilty of the knowledge of the financial statement and the falsity thereof. There are some cases that hold that the plaintiff must prove his innocence. The majority of the cases, however, hold

the contrary. 54 C.J.S. Malicious Prosecution § 84b(4), p. 1056. So we shall not base our decision herein on the guilt of plaintiff, though we might incidentally mention the fact that if we should send the case back for a new trial, plaintiff might find himself in a strait jacket in view of the statements of Catellier and Casey heretofore mentioned.

b. We must proceed then to discuss as to whether or not Steadman, as a reasonably prudent man, had cause to believe that under the evidence before him the plaintiff Topham was guilty as charged. That evidence consisted of the financial statement, the note, the mortgage and the fact that these documents were handed to him by the bank. Counsel for the plaintiff say that among the undisputed evidence "The most important fact is, of course, that Topham made absolutely no representations whatsoever to the Bank in connection with the loan and therefore committed no fraud." Reference is made to the plaintiff's testimony in the case. The so-called "most important fact" is of no importance at all. Topham was not charged with making representations but with knowing that representations had been made and that he received a loan on the strength thereof. The note and financial statement were handed to Steadman by the bank, which, it would seem, gave rise to a reasonable inference that the bank had relied on that statement when making the loan. There were no facts giving the impression that the indebtedness of $5,000 was that of Catellier or that the property mortgaged was not in fact the property of the party who signed the financial statement. Steadman found a mortgage before him stating the following:

"The undersigned, Norbert G. Catellier and Art T. Topham, of Park County, Wyoming, for the

purpose of securing the payment of Five Thousand and 00/100 Dollars, and interest according to the conditions of one promissory note of even date herewith, payable Dec. 20, 1955 for $5,000.00, do hereby sell and mortgage unto Richard Kranz and his assigns, the following described property, now in their possession, to-wit: All inventory, stock in trade, merchandise, furniture and fixtures located in our two stores, known as A & N Surplus, one store located at 1284 Sheridan Ave., Cody, Wyo. and the other store located at 166 Main St., Lander, Wyoming, owned entirely by me and without any encumbrances and are located at as stated above.

\*      \*      \*      \*      \*      \*

"Witness our hands and seal the 20th day of December, 1954.

"(signed) Norbert G. Catellier

"(signed) Art T. Topham (Seal)

"(signed) W. F. Messenger Witness"

Thus he found an instrument purportedly executed on December 20, 1954. It was signed by Topham and Catellier, mortgaging the property of A & N Surplus, Inc. The mortgage itself gave the clear impression that the mortgagors represented the corporation and that the indebtedness mentioned therein was the indebtedness of the corporation which was in existence on December 20, 1954, giving clear reason to believe that the financial statement of January 8, 1955, was false, regardless of the fact that the mortgage was in fact not acknowledged at that time. If Steadman was misled as to any of the facts, he was misled by the action of the plaintiff and Catellier in giving the mortgage in the manner above mentioned for which he could

not be held responsible. He had, we think, ample cause to believe that the financial statement in question in this case was false. So the only remaining question is as to whether or not Steadman had cause to believe that Topham knew of the making of the financial statement. He knew that Topham was the president of the A & N Surplus corporation, and that he and Catellier were the sole owners. That, if by nothing else, is shown by the mortgage. We have already seen the reaction on this point on the part of the county and prosecuting attorney, and the same is true, as hereafter mentioned, on the part of his deputy. We do not think that we can say that all these men acted unreasonably or imprudently in believing that Topham knew of the financial statement. Taking all the foregoing facts into consideration, and the inferences reasonably drawn therefrom, we are inclined to believe that the trial court erred in instructing the jury that there was a want of probable cause.

4. But to err is human. Lest we be mistaken in arriving at the above conclusion, we shall proceed to examine the defense of consultation of counsel. It was said in Montgomery Ward & Co., Inc., v. Pherson, 129 Colo. 502, 272 P.2d 643, 647:

"The rule that advice of counsel, properly taken and relied upon in good faith, is a defense to a suit for malicious prosecution applies with greater reason when the proceeding complained of was instituted by and with the approval of the prosecuting officer * * *."

To the same effect see Crim v. Crim, Ala. App., 101 So.2d 845, 849; Newell on Malicious Prosecution, 1892, p. 319. Most of the cases on the subject hold that this defense, if properly shown, at least establishes

the presence of probable cause.    Annotation, 10 A.L.R. 2d 1215, 1246 et seq.

Steadman testified that in an attempt to locate assets of the defendant he, on December 16, 1955, went to the courthouse and examined the records in the clerk's office and accidentally discovered that the mortgage in evidence in the case covered the same property which was in the financial statement and that he examined the latter statement for the purpose of determining that fact.   He testified that he then went up to the county and prosecuting attorney's office, got him to go down with him to the county clerk's office to look at the chattel mortgage which was on file; that he showed him the financial statement and also the judgment obtained pursuant to suit upon the note; that he also furnished the county and prosecuting attorney with a copy of the mortgage; that he had a further conference with him on December 19, 1955; that he made full disclosure to the county and prosecuting attorney of all the facts in his possession; that the county and prosecuting attorney told him that he had examined the papers which he had shown him and had examined the criminal statutes in Wyoming and that in his opinion a criminal offense had been committed in that the financial statement which was given to the bank was false; and that the first time that he, Steadman, thought of any criminal prosecution was after he discovered the mortgage on December 16, 1955.

Mr. Jack F. Lewis, County and Prosecuting Attorney of Park County, Wyoming, testified that he conferred with Steadman on December 16, 1955, and was shown the documents, namely, the chattel mortgage, the financial statement, the note above mentioned and the judgment which had been obtained against Topham,

and that he advised Steadman that in his judgment a crime had been committed. Some of the testimony in detail is as follows:

"Q. Did you have a further conference with Mr. Steadman [after December 16] with reference to this matter; and if so, when and where? A. It was on Monday the 19th, I believe, I called him and told him that I had gone over the papers and looked up the criminal statutes and conferred with my deputy, and that we felt that there was a criminal offense, and that I had prepared a criminal complaint, if he wished to sign it.

\*        \*        \*        \*        \*        \*

"Q. Will you state to the Court and Jury what, if anything you did say to him relative to this matter. A. I don't recall the exact words, but I most certainly said that I felt there was an offense committed or I wouldn't have issued the complaint.

\*        \*        \*        \*        \*        \*

"Q. [on cross-examination] He told you facts that led you to believe that on the 8th day of January, Mr. Topham procured a loan on the face of this financial statement? A. The facts were primarily the documentary facts.

\*        \*        \*        \*        \*        \*

"Q. Mr. Steadman told you Mr. Topham knew about this statement? A. I think in the course of telling me the circumstances, and from the documentary evidence, that he presented me, that since the note was signed by both Mr. Topham and Mr. Catellier, and that the statement was presented to the bank, that from that evidence it was certainly reasonable to believe that Mr. Topham knew of that statement.

"Q. Mr. Steadman told you that? A. I wouldn't say he told me all of that in so many words, but from the documentary evidence before me, I certainly assumed that.

*       *       *       *       *       *

"Q. You don't remember what he told you; is that right?. A. Yes, I remember he brought these documents to me, and he says, I think an offense has been committed; will you look them over and see what you think about it.

"Q. Is that all he said? A. Just about; yes."

Counsel for plaintiff contend that Steadman did not tell the county and prosecuting attorney all the material facts in the case. They say that Steadman did not advise the county and prosecuting attorney that no representations were made by Topham and therefore no fraud was committed by him. We have already mentioned that matter heretofore and need not repeat what we have said. Again they say that Steadman did not advise the county and prosecuting attorney about the renewal note given by the bank. That matter is wholly immaterial. The president of the bank explained that after the note of $800 given on January 27, 1955, became due he wanted a renewal of the note so that the bank examiner would not complain of having on hand notes which were overdue. The $800 note dated January 27, 1955, was not in fact paid, whatever some of the records of the bank may have shown. It was retained in the hands of the bank and given to Steadman and judgment was obtained for the amount due thereon. Furthermore, we are unable to see that whatever fraud may have been committed in connection with the note dated January 27, 1955, was wiped out by reason of any renewal or attempted renewal of the

note. Again it is contended that Steadman did not inform Lewis of the fact that the mortgage was not acknowledged until January 20, 1955. But Lewis saw the mortgage and obtained a copy of it. It spoke for itself. Steadman could not give any more information in that connection than the mortgage itself conveyed. Again counsel say that Steadman did not inform the county and prosecuting attorney of a letter dated December 6, 1955, directed to Catellier, in which Steadman wrote:

"I further wish to inform you that we intend to take every possible legal recourse to collect this judgment you people owe, and if you continue to ignore the situation with respect to this obligation I am sure that it is going to be not only unpleasant but expensive."

That letter, if it had any bearing in the case at all, and we do not think it did, went only at most to the question of malice and had nothing to do with the question of probable cause. Want of probable cause cannot be inferred from malice. Boyer v. Bugher, 19 Wyo. 463, 120 P. 171, 176; Verdier v. Verdier, 152 Cal.App.2d 348, 313 P.2d 123; Safeway Stores, Incorporated v. Barrack, 210 Md. 168, 122 A.2d 457. Moreover, the letter was dated December 6, 1955. Steadman did not discover the mortgage until December 16, ten days later. So it is difficult to see that the letter has any bearing herein.

We think that Steadman informed the county and prosecuting attorney of all the material facts in this case which by reasonable diligence he was able to ascertain. He was not required to seek out the plaintiff Topham and inquire of him as to the truth of the facts

which he gathered. Haines v. Atchison, T. & S. F. Ry. Co., 108 Kan. 360, 195 P. 592; Id., 108 Kan. 738, 196 P. 1079.

Counsel say that the jury did not believe that an attorney of the "vast experience" of the defendant relied upon the advice of the county and prosecuting attorney in this case and that the credibility of the defendant was for the jury alone to determine. We have no doubt that an argument similar to that was made to the jury in this case and that it had a large influence in causing the jury to bring in the verdict which they did. But it has been held that an attorney stands, in this connection, upon the same footing as any other person, so that the jury had no right to find otherwise. In the case of Terre Haute & I. R. Co. v. Mason, 148 Ind. 578, 46 N.E. 332, 336, the court said:

"* * * It seems to be contended, or at least suggested, that advice of counsel is for laymen, and that John G. Williams, the general manager, who supervised and directed the prosecution, being himself a lawyer of well-known ability, was not entitled to be protected in his action by the advice of counsel. The rule of law is applicable to all persons in the like circumstances; and one who, for himself, or as agent for another, is personally concerned in the bringing or defending of an action, is always in need of 'the advice of one who can view the facts calmly and dispassionately [Cooley on Torts, 2d Ed., 212],' no matter whether he be himself an attorney at law or not. * * *"

Counsel for plaintiff Topham argue that in order that anyone may rely on the advice of counsel it must be shown that he sought the advice in good faith and relied on it in good faith. The point is of considerable importance so that it deserves thorough investigation.

Counsel for the defendant say that Steadman actually acted in good faith, but they shed little light on the question. Steadman's case might have been strengthened somewhat if he had testified that he acted in good faith, but there is no such testimony, except that it appears from the testimony of the county and prosecuting attorney that Steadman believed that an offense had been committed. Counsel for plaintiff say that the jury were the judges of the credibility of Steadman and they apparently contend that in view of that fact the jury were entitled to conclude arbitrarily that he did not act in good faith. But that contention is, of course, not true.

54 C.J.S. Malicious Prosecution § 51b, p. 1017, lays down the rule that a defendant is required to (1) seek the advice of counsel in good faith; (2) to act on the advice in good faith; and (3) to believe that the charge is true. And at 54 C.J.S. Malicious Prosecution § 100, pp. 1093-1094, it is said that the question of good faith is ordinarily a question for the jury. The text is supported by many cases. See also Annotation, 10 A.L.R. 2d 1215, 1246-1252. Judge Tidball in an able opinion in Henning v. Miller, 44 Wyo. 114, 8 P.2d 825, 14 P.2d 437, discussed to some extent the question of good faith and belief in the facts, though not in connection with advice of counsel. The case throws at least some light on the question before us.

Many cases are silent on the question of good faith and lay down the absolute rule that one who discloses all the facts to counsel and only thereafter signs a complaint is fully protected against an action for malicious prosecution. Thus 34 Am.Jur. Malicious Prosecution § 163, p. 797, lays down the rule as follows:

"* * * On the other hand, if it appears without dispute that the statements to the attorneys were truthful, full and complete, giving all material facts and circumstances within the knowledge or information of the defendant, then the existence or nonexistence of probable cause becomes a question of law for the court, which should not be submitted to the jury."

In the case of Huf v. Hague, 171 Wash. 302, 17 P.2d 844, 846, the court stated:

"* * * In the case of Eberhart v. Murphy, 113 Wash. 449, 194 P. 415, 417, this court said: 'We have consistently held that an undisputed showing that the prosecuting witness had acted upon the advice of the prosecuting attorney, or other reputable counsel, after making a full and truthful statement of all the known facts, made it the duty of the court to find probable cause as a matter of law.' "

In Kennedy v. Crouch, 191 Md. 580, 62 A. 2d 582, 586, the court stated:

"* * * If a person who is contemplating the institution of a criminal proceeding obtains the advice of counsel learned in the law and acts thereon, he is protected not only because the adviser can view the facts calmly and dispassionately, but also because he has the ability to judge the facts in their legal bearings. Proof that he placed the facts fully and fairly before his counsel and acted upon his advice is a good defense to the charge of want of probable cause. * * *"

In Smith v. Transamerican Freight Lines, Inc., 72 Ohio App. 239, 51 N.E.2d 208, 210, it was said:

"* * * The law provides that if a defendant in an action for malicious prosecution makes a fair and

full disclosure of all the facts, covering the entire period involved, such disclosure shall constitute a valid defense to such action. * * *"

In Butler v. Lewis, 318 Ill.App. 225, 47 N.E.2d 512, syllabus 4 is as follows:

"When prosecuting witness fully and fairly states all facts relative to proposed prosecution to reputable counsel and receives advice from such counsel that there is probable cause for a criminal prosecution, and prosecuting witness acts on that advice, he has a complete legal defense to an action for malicious prosecution."

A case very similar to the case at bar is Jones v. Zimmerman, 180 Kan. 701, 308 P. 2d 96, 97. In that case Zimmerman informed the deputy county attorney in reference to the facts in the case. He had nothing to do with the writing of the complaint and did not tell the deputy county attorney what to put in it, but he signed the complaint prepared by the deputy county attorney. The court in that case stated as follows:

"The record shows that the defendant made full and true disclosure to the deputy county attorney of all facts within his knowledge * * *. Under the decisions of this court this is a defense to the plaintiff's action. Where a complaining witness has truthfully laid before the county attorney all the facts of which he has knowledge and the county attorney directs that a prosecution be instituted, the complaining witness will not be liable in damages * * *"

Numerous authorities to the same effect might be cited.

We find, accordingly, at least a disharmony in the cases, although we are not prepared to say that there

is a real conflict. Perhaps harmony is found in the fact that the cases which do not mention the question of good faith sub silentio considered that a prima facie case for good faith was made when full disclosure of the facts was made to an attorney and the advice was given that probable cause for prosecution existed. We cannot interpret the decisions of the Washington court, for instance, any other way. See Simmons v. Gardner, 46 Wash. 282, 89 P. 887, L.R.A.1915D, 16; Borg v. Bringhurst, 105 Wash. 521, 178 P. 450. In the case of Lacey v. Porter, 103 Cal. 597, 37 P. 635, 637, we read that "Taking the advice of counsel, however, tends to show good faith and honest motives and the absence of malice." In the case of Dunlap v. New Zealand Fire & Marine Ins. Co., 109 Cal. 365, 42 P. 29, 30, the court said:

"* * * If, in addition to his own belief he [the one signing the complaint] seeks the advice of one learned in the law, and, after a full and fair statement of the facts within his knowledge, is advised by him that they constitute a crime, his good faith in prosecuting the offender is corroborated. If, in addition to this, the person whose advice he seeks is the officer selected by the people to prosecute offenders against the laws, and he gives to that officer all the information that he possesses, and is then advised by him that a crime has been committed, and the prosecution is made upon a complaint prepared by that officer, his good faith is established. Accordingly, it is held that if the prosecuting witness seeks the advice of such officer, and lays before him all the facts within his knowledge relating to the alleged offense, and is advised by him that they constitute a crime, he is protected in prosecuting the same. * * *"

Good faith is a state of the mind. No man can read the mental workings of another except by and through

some outward manifestations. Without them no jury can or is entitled to attribute bad faith to a man's actions. Though advice of council in actions like this is a defense, still, so far as we have been able to discover, courts will not assume that a man's actions have been in bad faith but will assume the contrary unless evidence of bad faith appears. Thus it is said in the case of McConnel v. Street, 17 Ill. 253, 254, that good faith is the opposite of fraud and bad faith and its nonexistence, that is to say the nonexistence of good faith, as in all other cases where fraud is imputed, must be established by proof. It is said in 31 C.J.S. Evidence § 126, pp. 745-746, that in the absence of proof to the contrary it is proper to indulge a presumption that persons act honestly, properly and in good faith. Numerous cases are cited. In the case of Wright v. Ascheim, 5 Utah 480, 17 P. 125, 131, the court referred to a case where all the undisputed facts known to the defendant, taken together, would justify in a reasonable person the honest belief that the facts charged in the criminal complaint were probably true. The court then said:

"* * * In such case the defense would be absolute as matter of law, and the jury would have no right, under the pretense of saying the defendant did not believe, to find against him. If it were otherwise, the rule that what facts constitute probable cause in an action for malicious prosecution is a question of law for the court would have no meaning or force whatever. The jury might in every case, no matter what the facts might be under the pretense of unbelief on the part of the defendant, find against him. * * *"

In the case of McKenzie v. Canning, 42 Utah 529, 131 P. 1172, 1173, the court stated as follows:

"* * * We think the evidence, without conflict, shows that the defendant substantially stated to counsel all the material facts known to him; that upon them they advised him; that he, on such advice, instituted the criminal prosecution; and that in doing so he acted in good faith and upon a well-grounded belief of the plaintiff's guilt. It, however, in effect, is urged that before advice of counsel may be a defense it must appear, not only that the defendant fairly stated all the facts to counsel, and upon them was advised, but also that the defendant in good faith believed the plaintiff guilty of the charge, and that as to such fact the plaintiff was entitled to the judgment of the jury. That in some cases, dependent upon the nature of the evidence, may be true. But before the jury is justified in rejecting or disregarding evidence of the defendant's belief of the plaintiff's guilt, there must be some evidence, either from the nature of the evidence calculated not to justify such a belief, or tending to show the defendant's disbelief, or other facts or circumstances to justify a fair inference of the defendant's disbelief. In other words, the jury may not arbitrarily reject the defendant's evidence showing a well-grounded belief by him of the plaintiff's guilt. * * *"

The court in Sweatman v. Linton, 66 Utah 208, 241 P. 309, confirmed the two foregoing cases. These cases relate to the matter of belief in the guilt of the person who was prosecuted but there is no reason why the same rule should not apply to all other phases of good faith heretofore mentioned. In fact, it has so been held. In the case of Harris v. Woodford, 98 Mich. 147, 57 N.W. 96, the court held that in an action for malicious prosecution an instruction that probable cause cannot exist when good faith is lacking is erroneous if there is no evidence showing that defendant acted in bad faith. That case was confirmed in the

96

case of Pawlowski v. Jenks, 115 Mich. 275, 73 N.W. 238. In that case the court stated as follows:

"The evidence on the trial showed that all the facts were stated by defendant to his counsel before the chancery suit was instituted, and that he was advised that the complainants in that suit had a meritorious suit. This testimony is uncontradicted, and there are no circumstances which authorize an inference that defendant did not act in good faith. Under such circumstances, the advice of counsel made out a case of probable cause. Le Clear v. Perkins, 103 Mich. 131, 61 N.W. 357 [26 L.R.A. 627]; Poupard v. Dumas, 105 Mich. 326, 63 N.W. 301. Plaintiff's counsel contends that probable cause cannot exist where good faith is lacking, and cites Harris v. Woodford, 98 Mich. 147, 57 N.W. 96. In that case it was said, 'An instruction that probable cause cannot exist where good faith is lacking may be proper in a case which admits of the question.' This may be so stated in this case, but, before the force of the testimony showing probable cause—as by advice of counsel after a full statement—can be broken, there must be some testimony impugning the good faith of the defendant, as was distinctly held in Harris v. Woodford. There is no such testimony in this case."

Similar in effect is the case of Krause v. Bishop, 18 S.D. 298, 100 N.W. 434. In the case of National Surety Co. v. Page, 4 Cir., 58 F.2d 145, 150, 59 F.2d 370, a case of malicious prosecution, the court stated:

"* * * There is no evidence that the advice was not sought and acted upon honestly and in good faith upon a full and fair disclosure; and in such case the rule is well settled that such advice is conclusive on the question of probable cause. * * *"

The foregoing statement was cited with approval and applied in the case of Thomas v. Hinton, 76 Idaho 337, 281 P.2d 1050. In the case of Bradshaw v. Waterlow and Sons, Ltd., L.R. (1915) 3 K.B. 527, a case cited and quoted from by Judge Tidball in the Henning case, supra, the syllabus is as follows:

"In an action for malicious prosecution the question whether the defendant took reasonable care to inform himself of the facts before he instituted the prosecution ought not to be left to the jury unless there is some evidence of his not having made proper inquiries; and the question whether the defendant honestly believed in the charge which he made ought not to be left to the jury unless there is some evidence of the absence of that belief.

"There cannot be an absence of reasonable and probable cause when the Attorney-General has granted his fiat for the prosecution and it is not shown that the facts were put before him unfairly."

In the case at bar, the undisputed evidence is that Steadman acted upon the advice of the county and prosecuting attorney. There are no facts in this case which in any way indicate that he did not act in good faith. After Steadman conferred with the county and prosecuting attorney on December 16, 1955, and showed him the documents relating to the matter, the county and prosecuting attorney took three days in which to consider the matter. During that time he talked it over with his deputy and they both concluded that a crime had been committed and that Steadman was justified in signing a criminal complaint. The county and prosecuting attorney drafted the complaint and he called Steadman on December 19, 1955, and

told him that he had prepared it and that it was ready for Steadman's signature. Not until then did Steadman sign the criminal complaint involved in this case.

Finally we should call attention to the case of Anderson v. Friend, 85 Ill. 135, 137, where the court stated.

> "* * * If the advice of the attorney selected to institute and prosecute for crimes and offenses against the penal code will not protect the prosecutor, on the facts fairly stated, we should be at a loss to know what would protect him short of a conviction; but it does protect and shield him from a suit for malicious prosecution."

And it seems to us that the case of Laughlin v. Clawson, 27 Pa. 328, 330, quoted with approval in Van Meter v. Bass, 40 Colo. 78, 90 P. 637, 18 L.R.A.,N.S. 49, and also again approved in Montgomery Ward & Co., Inc., v. Pherson, 129 Colo. 502, 272 P.2d 643, fits the case at bar. In that case the court stated, among other things, as follows:

> "* * * If the officers of the state, who are appointed on account of their legal learning, consider that a given state of facts is sufficient evidence of probable cause, how can the private citizen be said to be in fault in acting upon such facts, and how can the state condemn him to damages for so doing? To decide so is to use the machinery of government as a trap to ensnare those who trust in government for such matters, and who ought to trust in it. If such officers make a mistake, it is an error of government itself, and government cannot allow the citizen to suffer for his trust in its proper functionaries. * * *"

Steadman, though an attorney, is, as heretofore stated, entitled to the benefit of the rule relating to advice of counsel the same as anybody else.

In view of what we have heretofore said, we do not see how we can escape the conclusion that the advice given to Steadman is a complete defense herein, insofar as probable cause is concerned, and that, accordingly, the court erred in not entering judgment in favor of Steadman notwithstanding the verdict. In view of what we have said it is not necessary to consider the question of malice. Lipowicz v. Jervis, 209 Pa. 315, 58 A. 619; Smith v. Patton, 12 Pa.Dist. & Co.R. 393, 395.

In conclusion we should not omit to mention the fact that Steadman acted very ill-advisedly. The function of a lawyer is to protect, counsel and advise his clients and to protect and defend them in court. Howsoever important it is that the criminal laws of the state be enforced, yet a lawyer, unless he is the officiating prosecuting attorney or his assistant, should not engage in filing criminal complaints in connection with any matter that he handles for a client. That should be left to the client or to the county and prosecuting attorney. When a member of the legal profession, with the exceptions named, files such criminal complaint, he distinctly lowers the dignity of his profession. What the public thinks as to whether or not he should file such complaints is clearly shown by the drastic verdict of the jury rendered in the case at bar. It should be a warning to every member of the legal profession.

The judgment of the trial court is reversed with direction to enter judgment in favor of Steadman.

Reversed with direction.