**Donald L. CROW, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 83–2453.

United States District Court,
D. Kansas.

April 14, 1987.

**558**

Mark S. Gunnison, R. Pete Smith, McDowell, Rice & Smith, Kansas City, Kan., for plaintiff.

Benjamin L. Burgess, Jr., U.S. Atty., Robert A. Olsen, Asst. U.S. Atty., Kansas City, Kan., for defendant.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This case arises out of an undercover investigation by the Postal Inspection Department of the United States Postal Service, which led to the prosecution of plaintiff for mail fraud. At plaintiff's criminal trial, the court entered a judgment of acquittal at the close of the government's evidence. Plaintiff now brings this action against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.*, for malicious prosecution and outrage. Trial to the court was held on January 6-8, 1987, on the issue of liability only. After carefully reviewing the evidence and the memoranda of the parties, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. The plaintiff, along with other lawyers and doctors, was targeted for investigation by the Postal Inspection Service as part of an undercover investigation involving fraudulent insurance claims. This investigation was entitled "Medical And Insurance Liability (MAIL) Fraud Investigation" [hereinafter MAIL fraud investigation] by the Postal Inspection Service.

2. As part of their investigation, the Postal Inspectors staged and created the appearance of automobile accidents in which they were allegedly involved.

3. With respect to the investigation of plaintiff, the inspectors assumed the following identities: Robert Schick assumed the identity of Robert Thomas; L.A. Armstrong assumed the identity of Darren Gregory; Robert Bush assumed the identity of Robert Ward; I.L. Gillis assumed the identity of Loretta Ward; and P.A. Glick assumed the identity of Priscilla McCally.

4. The inspectors procured false driver's licenses from the State of Missouri under their fictitious names.

5. The inspectors, through the help of Officer John Hamilton of the Kansas City, Missouri, Police Department, prepared a fictitious accident report stating that a car driven by Robert Thomas rear-ended a vehicle driven by Robert Ward. According to the report, Thomas' car was traveling at a speed of twenty-five to thirty miles per hour. The report stated that "all claimed no apparent injuries at this time."

6. Officer Hamilton issued a fictitious citation to Robert Thomas for careless driving. Thomas appeared before a judge of the Kansas City, Missouri, Municipal Court, pleaded guilty and was fined by the judge. The judge and prosecutor were never advised that the accident or citation was fictitious.

7. A fictitious liability insurance policy had previously been procured from the Travelers Insurance Company of Overland Park, Kansas, in the name of Robert Thomas.

8. The Postal Inspectors created two fictitious automobile damage estimates using what appeared to be authentic forms from an automobile dealer and a body repair shop in the Kansas City area.

9. The Postal Inspectors, posing as the driver and passengers of the car supposedly rear-ended by Thomas, sought to engage plaintiff to represent them in their legal claims arising out of the automobile accident. The Postal Inspectors met personally with plaintiff in his Kansas City, Missouri, office and talked to him over the telephone a number of times from July 1980 through February of 1981. All telephone conversations and meetings between plaintiff and the inspectors were surreptitiously tape recorded.

10. The first telephone call to plaintiff was made by Gregory on July 8, 1980, to schedule an appointment. That afternoon, Inspectors Armstrong and Glick (posing as Gregory and McCally) met with plaintiff to see if he would represent them. The recording equipment used by the inspectors failed to function. According to the memorandum prepared by Inspector Armstrong, with Inspector Glick's assistance, the following took place: Gregory informed plaintiff that their car had been rear-ended. When plaintiff asked whether they were hurt, Gregory informed him that "the other car wasn't going that fast, but that we had been sort of shook up." Gregory informed plaintiff that the trunk and bumper were bent a little but that there wasn't too much damage. When plaintiff asked Gregory if they had a family doctor, he responded that they didn't have a family doctor, but were thinking about seeing a Dr. Wells. When plaintiff specifically asked if McCally was going to see a doctor, Gregory replied that McCally was going to go with him to see whichever doctor he saw. Plaintiff then asked the inspectors where they were sitting in the car. Gregory informed plaintiff that he was sitting in the center on the back seat and that McCally was sitting next to the right rear door in the back seat to Gregory's right side. According to the inspectors' memorandum, Crow then suggested "that [Gregory], who would have been seated on the hump, should report that his lower back was hurt. [McCally], who would probably have jarred her head toward the door, should report that she had neck injuries." Plaintiff told the inspectors

that he would take their case and that they should go ahead and see their doctor.

11. Later on that same day, Gregory phoned plaintiff and informed him that they had contacted Dr. Wells. Gregory told him that the doctor's $65.00 fee was too high and wondered if plaintiff could find them another doctor. Plaintiff suggested that they should try and find another M.D., but if they could not do so they could go to a Chiropractor. Gregory suggested that plaintiff contact a Dr. Barquist and gave Gregory his phone number.

12. The next contact occurred on July 23, 1980, when Gregory telephoned plaintiff and informed him that he and McCally had seen a physician and were both receiving heat treatments twice a week. Gregory also set up an appointment for plaintiff to meet with the other two passengers in the car, Robert and Loretta Ward.

13. On the following day, July 24, 1980, plaintiff met with Inspectors Bush and Gillis (posing as Robert and Loretta Ward) and Inspector Armstrong (posing as Gregory). Plaintiff asked the Wards if they had been to a doctor. Robert Ward answered that they had not. The following conversation then took place.

DLC: Not yet, uh, what has it been, about 30 some odd days?

DG: Un-huh, 24 days or 25 days cause it happened on the 30th.

DLC: You have a doctor to go to?

RW: No.

DLC: Are you suffering pain and discomfort?

RW: Uh, not right now, no.

DLC: Did you before?

RW: Yeah, well when, the guy hit us, that's how I, you know, broke my glasses uh, and uh ...

DLC: How long did you have pain? Just a few days?

RW: Few days after that.

DLC: And you haven't had any since?

RW: No.

DLC: How about you?

LW: I'm all right ... doing okay.

DLC: Did you, you didn't go to the doctor or anything?

RW: No, I haven't been anywhere.

Plaintiff then informed the Wards that in order to recover from an insurance carrier they had to suffer some kind of an injury and because of that injury, they had to expend some money, generally in medical expenses. He also told them that in order to recover more than their actual out-of-pocket expenses, they had to incur some permanent injury or experience a continuing aggravation of the injury. Plaintiff informed them that because they obviously had no permanent injuries and had received no treatment since the accident, they were not entitled to recover anything. He told them, "just because you are in an accident, doesn't mean you are entitled to some money...." He then told Robert Ward that he could possibly recover if his injuries or the pain that he suffered reoccurred and he went to a doctor for treatment.

Plaintiff then turned his attention to Darren Gregory and asked him if the doctor had indicated that his injury was of a permanent nature. Gregory replied that the doctor was still treating himself and McCally. Loretta Ward asked plaintiff if it was not too late to see a doctor. Plaintiff responded that it was not too late, "particularly, if you had pain." He told Ward that if she did go to a doctor, she should "be sure and tell them that two or three days after the accident that you had quite a little bit of pain."

Plaintiff and Robert Ward then discussed Ward's job. The following conversation ensued:

DLC: All right, what kind of work do you do?

RW: Landscaping ...

DLC: Okay, but that you just couldn't take the time off from your work because ... uh

RW: ... Well, no, I had time but, ...

DLC: The high period of your work, and that for several days you just took aspirin and slept on a heating pad and took hot baths and you felt a little bit better but it just has never completely stopped hurting and you're getting concerned about it. And, uh, with that and with the visit to the doctor and

some idea from him as to treatment, and, uh, course, you know these things are almost entirely complaints of the patient, very little can be seen in an x-ray, unless you've chipped a bone or ... the typical thing that is seen in a neck or back pull or strain is that the muscle knots up and may pull the spine out of alignment as a result of the contraction of the muscle on the side where it is injured.

RW: All right.

Next, Robert Ward asked plaintiff if he knew of a doctor that they could go to. Plaintiff responded that he did not know any M.D.'s but that he knew of a Chiropractor. Plaintiff noted, however, that a Chiropractor is "not worth the same in a, in a settlement negotiation and of course something like this really isn't something you try, isn't worth as much as a doctor, an M.D." He then stated:

Now, you add that with the fact that it's 30 days down the line and you know, you're building a pretty good road block for me is what you are doing. If you had come in here immediately, I probly'd said you know, take your choice, chiropractor or M.D., it doesn't make a hell of a lot of difference, because of the lag in time an M.D., would be better. If you don't want to go to an M.D., I'll send you to a chiropractor with the knowledge that if we cannot produce a claim that you'd have to pay his bill.

Plaintiff went on to add:

Assuming that [the doctor] says you have pain, you have stretched ligaments, you have a sore back, a sore neck and he can attribute that to the accident 30 days ago, all right, assuming those things there'll be some kind of recovery from the other insurance carrier, assuming there is an insurance carrier and I think, hasn't someone else already recovered from them or been in contact with an insurance carrier?

Plaintiff then explained to the Postal Inspectors how he would recover his fees. Under the first plan, the clients would pay their doctor bills and all of the expenses out of the insurance recovery and plaintiff

would receive fifty percent of the remaining amount. Under the alternative plan, plaintiff would recover one-third of the client's total recovery. The client would be responsible for paying the doctor's bills and expenses out of the remaining two-thirds.

At the conclusion of their meeting, the following conversation took place:

DLC: Once you start to see the doctor and he accepts you as a patient and has determined that there is something that he can treat, that's all I need.

DG: Well, he's definitely treating us.

DLC: Then I'm ready to go.

14. On July 30, 1980, McCally telephoned plaintiff and informed him that she was seeing a doctor. She then set up an appointment for herself and Darren Gregory to meet again with plaintiff. This meeting apparently never took place.

15. On August 11, 1980, Gregory telephoned plaintiff and set up another appointment. Gregory informed plaintiff that the Wards had been in to see his doctor.

16. On August 13, 1980, Gregory and McCally met with Lois Echols, plaintiff's legal assistant. Echols reviewed the accident report with Gregory and McCally and took down general information. When Echols asked them whether they were injured in the accident, Gregory replied, "oh, we both been to the doctor, yes ma'am." When asked the nature of his injuries, Gregory replied, "uh, I am being treated for lower back injuries." He then said that Ann (apparently meaning McCally) was receiving treatments for her shoulder and lower back. The following conversation then took place:

LE: ... Okay, so your injuries are the lower back?

DG: Yes mam.

LE: And what, around the shoulder area?

DG: No, just my lower back.

LE: Just the lower back?

DG: Yeah.

LE: No headaches, no dizziness, no, no nothing else?

DG: No mam, just the low back.

LE: And which doctor or hospital did you go to?

DG: Okay, we are receiving treatment from Dr., uh.

PM: Warren.

When Echols asked McCally whether her injuries were similar to Gregory's, both McCally and Gregory answered to the effect that McCally was being treated by the doctor for her upper back and neck. When Echols asked whether the driver had rear-ended their car "pretty good," Gregory responded, "well, he, he did hit us pretty good and it shook us up pretty good."

17. On August 26, 1980, Gregory telephoned plaintiff to let him know that the Wards were being treated by his doctor.

18. On September 2, 1980, Robert Ward contacted plaintiff by phone and set up an appointment to meet with plaintiff the following day.

19. On the following day, September 3, 1980, Robert and Loretta Ward met with plaintiff in his office. The Wards told plaintiff that they had both been treated by Dr. Warren on two occasions. When plaintiff asked Loretta Ward what injuries she had suffered, she responded, "I think the doctor put down, uh, soreness in...." They then went on to discuss the damage to Wards' car. Robert Ward told plaintiff that the rear and right quarter of his car were damaged. He also told the plaintiff that he had never fixed the car and that he had since sold it to someone that he knew. Plaintiff requested that Robert take several pictures of the car. They then discussed how the accident actually happened. The following conversation ensued:

DLC: Okay, what were your injuries?

RW: Uh ...

LW: The opposite of mine ...

RW: Yeah, it'd be in the report cause he, either he told her upper back and neck and me lower back or vice versa.

DLC: But just neck and back.

RW: Yeah. It would be in that report.

DLC: Okay. You don't have any other problems or anything either do you?

RW: Huh-uh.

Plaintiff then discussed whether Robert had missed any time off work due to the accident. The following conversation took place:

DLC: Did you lose any work as a result of this?

RW: No.

DLC: They won't, they won't give you a slip that you missed two or three days work? You know anybody there?

RW: Yeah, well, my foreman, he like, uh, he's given me breaks about coming to work and stuff, so if I, I can get a slip from him if I have to.

DLC: Well, if you can, it is worth something.

RW: Okay.

DLC: Otherwise, uh, on the 30th, I don't know what day of the week, what day of the week was that?

RW: I don't know, but it was ... I'll tell you that was a good week to work, you know.

LW: Monday, I think wasn't it?

DLC: Did you miss any work that week?

RW: Well, I didn't go to work that day.

DLC: Were you suppose, well, it was 5 o'clock though. The work day was over, wasn't it?

RW: No, no, not as long as the sun's out. We can go to about 8 or 9.

DLC: How about the next day? How about later that week? Did you miss a couple of days? That would be more realistic.

RW: Okay, I will get a slip from them.

DLC: About two days.

.      .      .      .      .

RW: Okey doke. How many days should I, do that work, that miss work slip for, that I got to get?

DLC: If you only went to the doctor, uh, when did you ... when is he going to say you first went to the doctor?

RW: He's going to say like a couple days after that accident.

DLC: Okay, the day you went to the doctor, you probably missed that day and the next day.

RW: Okay.

DLC: So you find out from him what the day is you went to the doctor.

RW: Okey doke.

LW: Okay.

LW: And then pictures of the car and that's all?

DLC: Pictures of the car. Okay. I'll take it from here.

20. Inspector Bush, with Inspector Gillis' assistance, wrote a memorandum summarizing what took place in the September 3 meeting. The memorandum stated in part:

We spoke with Atty. Crow about our accident of June 30, 1980. Atty. Crow asked how many visits and what treatments we had received from Dr. Warren. I answered we had seen Dr. Warren twice, and Dr. Warren stated he would take care of our visits and backdate our medical records. I told Atty. Crow that we had received no medical treatments. Atty. Crow asked if I had missed any work. I answered no. Atty. Crow told me I should get a slip from work showing I missed a couple of days. He added, the days I should miss should be the day of my first doctor visit and the next day.

21. On October 16, 1980, McCally telephoned plaintiff to see if he had received the medical reports from Dr. Warren. Plaintiff stated that he had not yet received them, but that he would contact Warren's office.

22. On November 13, 1980, Robert Ward telephoned plaintiff to determine the status of his case. Plaintiff told Ward that he had received the reports from Dr. Warren on all four of his clients and that he would soon be submitting a demand to the insurance company. Plaintiff asked Ward if he had any lost wages and Ward responded that he had sent a wage loss statement as requested by plaintiff. They also discussed the fact that the three other passengers were unemployed.

23. Again, on December 10, 1980, Robert Ward telephoned plaintiff to discuss having his car inspected by The Travelers Insurance Company. Ward explained to plaintiff that he no longer had the car. The following conversation ensued:

RW: I got rid of that car I had, thought I had told you.

DLC: Did you get any estimates on it?

RW: Huh-uh. I got a friend I can get some estimates from but I have gotten rid of that car about two weeks after the accident.

DLC: Get me some estimates dated prior to the time you got rid of it. Two estimates.

RW: Two estimates prior to the time, okay.

DLC: Do you have any pictures of it?

RW: No, I ain't got no pictures of it.

DLC: Get the estimates.

24. Two days later, Loretta Ward telephoned plaintiff to check on her insurance claim. Plaintiff told Ward that he had sent a demand letter to The Travelers Insurance Company in early December and that they had requested a repair bill on the Wards' car. Plaintiff explained that if the insurance company did not respond within the next thirty days, he would contact the company.

25. On January 30, 1981, Gregory telephoned plaintiff's office. Plaintiff told Gregory that a settlement had been worked out with the insurance company and that they would be sending the drafts concerning Gregory's and McCally's claims. Gregory set up a time to meet with plaintiff to pick up their checks.

26. On February 2, 1981, Robert Ward and Gregory met with plaintiff. Plaintiff explained to Gregory that his settlement came to a total of $3,000.00. After subtracting expenses for the doctor's bills and attorney's fees, Gregory received $1,065.00. Plaintiff explained that Dr. Warren had written Gregory "the poorest report of all." The following conversation then took place:

DC: He cheated on me.

DLC: Well the guy must have gotten tired by the time he got to yours. Hell, you all went over there for the same treatment.

DG: Sure did.

DLC: He treated the Wards some $200 or $300 more than he treated you all. What, were there some times you couldn't get over there or something?

DG: Well we, I guess he didn't want them to look [....]

DLC: Yeah

DG: Too much alike.

Plaintiff then explained that McCally had received a total of $2,300.00 in settlement, with $715.00 going to her. Plaintiff told McCally, "you weren't hurt as bad as him, you know I could read the reports now that I look back on it and I can see where he saw the difference but he couldn't write them all alike."

After receiving their checks, Gregory thanked plaintiff for the great job he had done for McCally and himself. Crow responded, "Well, I was pleased. You know when you start with nothing, when you end up with something to spend, that's not bad."

27. Inspector Schick was the case agent in charge of the MAIL fraud investigation. As the case agent, he supervised the other Postal Inspectors and coordinated the investigations of the different doctors and lawyers. He also acted as liaison between the Postal Inspection Service and the United States Attorney's Office.

28. As part of his responsibilities, Schick submitted written status reports to the United States Attorney's Office for the District of Kansas in Kansas City, Kansas, to keep that office informed of the investigation's progress. In a report dated July 8, 1980, Schick informed the United States Attorney's Office that the investigation was "based upon a referral by the Insurance Crime Prevention Institute (ICPI) of fraudulent medical and accident claim files submitted by an insurance fraud ring."

29. An undated status report by Schick stated that when Inspectors Bush and Gillis (posing as Robert and Loretta Ward) were introduced to plaintiff by Inspector Armstrong (posing as Gregory), Armstrong told plaintiff that "they were passengers in the same vehicle on June 30 and did not sustain any injuries."

30. Another status report by Schick dated September 23, 1980, regarding the Sep-

tember 8 meeting with plaintiff, indicated that after Inspectors Armstrong and Glick (posing as Gregory and McCally) "told [plaintiff] that they had not in fact been injured, [plaintiff] suggested where they should complain of injuries when contacting the doctor." The report also stated that, in their September 3 meeting, plaintiff "requested Inspector Bush [Robert Ward] to have a wage-loss statement falsified and sent to him."

31. Another status report by Schick, dated March 11, 1981, disclosed that plaintiff "encouraged the Inspectors to submit inflated vehicle damage estimates and medical reports." The report also stated that Dr. Warren's medical reports were back-dated and that plaintiff was advised of this back-dating. Additionally, the report disclosed that plaintiff encouraged the Inspectors as to what areas of the body they should claim were injured.

32. On May 5, 1981, Schick wrote a "presentation letter" summarizing the investigation of plaintiff and Dr. Warren, and submitted it to the United States Attorney's Office. Among other things, the report disclosed the following:

(1) Inspectors Armstrong and Glick (posing as Gregory and McCally) met with plaintiff on July 8, 1980, and "explained that they had been in an auto accident on June 30 and had not sustained any personal injury."

(2) Plaintiff agreed to represent Gregory and McCally if "a doctor could be located to show that they had injuries and had made visits closer to the June 30 accident date."

(3) On July 24, 1980, when Inspector Bush and Gillis (posing as Robert and Loretta Ward) met with plaintiff, plaintiff "inquired if they were currently suffering any pain as a result of the accident, to which they replied they were not."

(4) When Inspectors Bush and Gillis (posing as Robert and Loretta Ward) returned to see plaintiff on September 3, 1980, plaintiff asked Inspector Bush if "he could obtain a fictitious Wage Loss Statement from his employer."

(5) In a telephone conversation on December 10, 1980, plaintiff asked Inspector Bush (posing as Robert Ward) "for two estimates [of automobile damage] to reflect they were written within two weeks following the accident."

(6) Plaintiff misrepresented the following facts in his correspondence of November 25, 1980, to the Travelers Insurance Company:

(1) Robert Ward sustained injuries to his low back, neck and shoulders; (2) Robert Ward lost three days of wages as a result of the accident; (3) Loretta Ward suffered injuries to her neck and back area; (4) Priscilla McCally suffered injuries to her neck and low back area; and (5) Darren Gregory had sustained injury to his low back as a result of the collision. Additionally, the attorney misrepresented to The Travelers that (6) $626.14 in vehicle damage was sustained to the Ward vehicle.

The letter also named plaintiff and Dr. Warren as "proposed defendants" and listed a number of witnesses who would testify against plaintiff and Dr. Warren, along with their anticipated testimony.

33. Schick testified at trial that he listened to all of the tapes of the phone conversations and meetings and read the inspectors' memoranda before writing his status reports and presentation letter. He also testified that he made copies of the original tapes onto reel-to-reel tapes.

34. Schick testified that, prior to indictment, he gave the Assistant United States Attorney working on the case all of the available tapes and equipment to listen to the tapes. Furthermore, he testified that he gave the Assistant United States Attorney transcripts of the July 23 and September 3 meetings and all phone conversations prior to indictment.

35. Schick also testified that he expected the United States Attorney's staff to read, believe and rely upon the information he placed in his status reports and presentation letter.

36. Assistant United States Attorney John O. Martin, of the Kansas City, Kansas, office, was the prosecutor assigned to

handle the MAIL fraud cases, including plaintiff's case. Generally speaking, the Postal Inspectors, rather than Martin, decided how the undercover investigations were to be handled. Martin did, however, discuss with the inspectors that they were not to come right out and openly admit that they wanted to commit fraud. Rather, the inspectors were to subtly get their message across to the suspect through the use of nonverbal communication and other means.

37. Schick, however, testified at trial that he believed the plan was for the inspectors to use a more direct approach—he expected the inspectors to actually tell the doctors and attorneys that they had not suffered any injuries, but that they nevertheless wanted to submit claims to the insurance companies. In contrast, Inspector Armstrong testified at trial that the inspectors were careful not to directly tell the suspects that they intended to defraud the insurance companies. He testified that he was concerned that if they actually told the suspects that they weren't injured and wanted to "rip-off" the insurance companies, the attorneys would refuse to represent them and the doctors would refuse to treat them.

38. Martin kept informed of the investigation's progress through informal weekly meetings with the inspectors. During the investigation, Martin was also in daily contact with Inspector Schick.

39. It was Martin's general practice during any investigation to meet with the investigating agents and discuss with them the elements of the targeted offenses and what would have to be proven to successfully prosecute the suspect.

40. Martin testified at trial (by way of deposition) that he had no recollection of Schick bringing to the United States Attorney's Office either the reel-to-reel tapes or a reel-to-reel tape player. According to Martin, neither he nor the United States Attorney's Office had a reel-to-reel player to play back the tapes. However, Martin specifically recalled listening to some of the tapes in Schick's office. He recalled listening to tapes involving conversations with plaintiff, but could not recall if he listened

to each and every one of the tapes involving plaintiff.

41. It was Martin's standard practice to make his own independent evaluation of any tape recordings and other documents reflecting what took place in undercover meetings, regardless of what a Postal Inspector might have put in his investigative reports. Martin, however, did not recall what he reviewed prior to drafting plaintiff's indictment or before presenting evidence concerning plaintiff to the grand jury. Martin was sure, however, that he listened to some of the tapes and read some of the transcripts of the tapes involving plaintiff before plaintiff's case went to the grand jury. Martin testified that he did not specifically recall reading the inspectors' memoranda or Schick's reports or presentation letter, but that he probably reviewed them. He stated that, although he would have expected the presentation letter to accurately reflect what was in the tape recordings, he generally did not rely heavily on such letters.

42. Martin had the sole responsibility to decide whether to seek indictment by the grand jury of plaintiff and all of the other MAIL fraud suspects.

43. A grand jury was convened in Kansas City, Kansas, to hear evidence against plaintiff and the other suspects targeted by the MAIL fraud investigation. The grand jury was informed that a total of 240 tapes were made of the suspects' conversations and meetings. Martin told the grand jury that he would play all of the tapes if the grand jury specifically requested to hear all of them. Otherwise, Martin informed the jury that he would select and play only the more significant tapes.

44. Before presenting the MAIL fraud suspects' cases to the grand jury, Martin and Schick discussed which tapes to play for the grand jury. Martin, however, made the final decision as to which tapes were more significant.

45. With respect to plaintiff's case, the grand jury listened to only one tape recording—a tape of the September 3, 1980, meeting between plaintiff and Inspectors Bush

and Gillis (posing as Robert and Loretta Ward).

46. In addition to this tape, the grand jury heard testimony from Inspector Schick. From the grand jury transcript, it appears that Schick read a portion of the transcribed tape of the December 10, 1980, phone conversation between plaintiff and Inspector Armstrong (posing as Gregory).

47. Schick was the only Postal Inspector to testify before the grand jury. None of the inspectors' memoranda or Schick's status reports or presentation letter were presented to the grand jury.

48. In discussing the MAIL fraud investigation in general, Schick told the grand jury on June 15, 1981, the following:

During the initial visit to the doctor or attorney the inspector would present to him or her that he or she had been in an accident but not been injured. The sole purpose of the inspector's visit was to determine if the doctor or attorney would prepare or send fraudulent medical reports and/or bills to an insurance carrier knowing that the medical charges and/or reports were fraudulent.

49. Schick also told the grand jury that all of the suspects were targeted in the following manner: First, the individuals were suspected through the Postal Inspection Service's previous investigations. The Postal Inspectors then indexed these names through the Insurance Crime Prevention Institute Index System. By indexing these individuals through this system, the Postal Inspectors could identify the number of claims that the suspects were making on a yearly basis. The Postal Inspectors could also discover what doctor was associated with what attorney on a mutual referral basis. When a grand juror asked, "they had a pattern from past practice then?", Schick responded, "yes."

50. Schick admitted at trial that in fact plaintiff never had been indexed through the Institute's system and that he knew this. He also admitted that he never informed Martin of this fact.

51. When a grand juror asked Schick what type of injuries the undercover inspectors claimed in their investigation, Schick responded:

We claimed no injury at all. None at all. We just went to the attorney or the doctor and told that individual we'd been involved in an accident and that we wanted to rip off an insurance company and we needed a phony report, medical report.

52. Schick told the grand jury that when Inspectors Armstrong and Glick (posing as Gregory and McCally) met with plaintiff on July 8, 1980, "the inspector related to the attorney that he had been involved in the accident, had not sustained any injury but wanted to make a fast buck." He also told the jury that plaintiff told Armstrong and Glick where they should complain of injuries.

53. Schick testified before the grand jury that when Inspectors Bush and Gillis (posing as the Wards) met with plaintiff on July 24, 1980, Bush related to plaintiff "that he was in the accident too and they were interested in making some money." He then testified that after visiting Dr. Warren on July 29, Inspectors Bush and Glick returned to plaintiff's office and "related to him that Dr. Warren had agreed to furnish back dated medical visits for treatment and had also agreed to provide a medical report in which—explaining they had injuries as a result of the accident." Furthermore, Schick testified that after Inspector Bush told plaintiff that the vehicle involved in the accident had been sold two weeks after the accident, plaintiff told Bush "to locate someone, prepare a vehicle damage estimate for a stated amount, back date that estimate to shortly after the accident and furnish it to him."

54. Martin drafted the indictment of plaintiff and submitted it to the grand jury. The grand jury returned the indictment on June 16, 1981. It charged that plaintiff and Dr. David Warren devised and intended to devise a scheme and artifice to defraud and obtain money by means of false and fraudulent pretenses and representations from insurance companies, including The Travelers Insurance Company. It alleged seven counts of mail fraud in viola-

tion of 18 U.S.C. § 1341 and § 2 and one count of inducing travel in interstate commerce in violation of 18 U.S.C. § 2314.

55. Shortly thereafter, plaintiff was informed by phone of the indictment and was asked to surrender himself to federal authorities. Plaintiff testified at trial that surrender was very traumatic—he was booked, fingerprinted and photographed. Plaintiff also testified that he heard a news report on the radio about his indictment and that he had to hastily call his parents to prevent them from learning of the indictment over the radio or television. Additionally, plaintiff testified that the entire incident was "rather devastating."

56. On December 14, 1981, the criminal trial of plaintiff was commenced in the United States District Court for the District of Kansas. At the close of the government's evidence, Judge Saffels entered a judgment of acquittal, finding as follows:

> In the instant case ... the evidence in the form of surreptitiously recorded conversations between undercover postal agents and defendant, together with the agents' memories of this and other conversations, revealed a series of acts and circumstances which pointed only to the exoneration and innocence of defendant [Crow]. Only the most unreasonably strained view of evidence would have pointed to proof of fraudulent intent on defendant's part.

*United States v. Crow,* No. 81–20074–01 (D.Kan, *unpublished,* Dec. 22, 1981).

57. On or about December 9, 1982, plaintiff filed a claim with the United States Postal Service pursuant to the Federal Tort Claims Act. After the Postal Service failed to make final disposition of plaintiff's claim within six months of his filing, plaintiff filed this action on December 9, 1983.

58. After carefully reviewing the tapes, transcripts and testimony in this case, the court finds that numerous discrepancies exist between what was said in the actual tape-recorded conversations and what was filed in the Postal Inspectors' reports. Numerous other discrepancies exist between what was said in the taped conversations and what was testified to before the grand jury. The court finds that the Postal Inspectors made various material false, misleading and inaccurate statements in their reports, memorandum and presentation letter. The court also finds that Inspector Schick made false, misleading and inaccurate statements in his testimony before the grand jury. The court will not go into great detail describing each of these statements—many are apparent from the record. We will, however, point out what we believe to be the more significant misrepresentations and false statements.

59. The court finds that Inspectors Bush and Gillis in their September 3, 1980, memorandum made the following inaccurate and false statements concerning their meeting with plaintiff:

(a) Inspector Bush told plaintiff that Dr. Warren stated that he would back-date their medical records; and

(b) Inspector Bush told plaintiff that he and Inspector Gillis had received no medical treatments.

60. The court finds that Inspector Schick, in his July 8, 1980, status report, made a misleading statement that the investigation of all of the MAIL fraud suspects was based upon a referral by the Insurance Crime Prevention Institute.

61. The court finds that Inspector Schick, in an undated status report, made a false statement when he wrote that, after Inspector Armstrong (posing as Gregory) introduced Inspectors Bush and Gillis (posing as the Wards) to plaintiff, Armstrong told plaintiff that they had not sustained any injuries.

62. The court finds that Inspector Schick, in a status report dated September 23, 1980, made the following misleading and false statements concerning meetings with plaintiff:

(a) On July 8, 1980, Inspectors Armstrong and Glick (posing as Gregory and McCally) informed plaintiff that they were not injured; and

(b) On September 3, 1980, Inspectors Bush and Gillis (posing as the Wards)

told plaintiff that Dr. Warren would provide a back-dated medical report. Although there is no tape of the July 8 meeting to compare statement (a) to, Armstrong's memorandum reflects that neither he nor Glick ever told plaintiff that they were not injured. Rather, they told plaintiff that they had been "shook up" when he asked whether they had been hurt. They also told plaintiff that they had been thinking of seeing a doctor. Armstrong admitted at trial that they never told plaintiff that they had not been injured. Because Armstrong actually heard and participated in the conversation at issue, the court finds his version of the facts more credible than the version of Schick, who was never present at the July 8 meeting.

63. The court further finds that Inspector Schick, in a status report dated March 11, 1981, made the following inaccurate and false statements:

(a) Plaintiff encouraged the inspectors to submit inflated vehicle damage and medical reports; and

(b) Plaintiff was advised that Dr. Warren's medical reports were back-dated.

64. The court also finds that Inspector Schick, in his May 5, 1981, presentation letter to the United States Attorney's Office, made the following inaccurate and false statements:

(a) Inspectors Armstrong and Glick (posing as Gregory and McCally) told plaintiff on July 8, 1980, that they had sustained no injuries;

(b) Plaintiff agreed to represent Gregory and McCally only if they could find a doctor to back-date their medical reports;

(c) Plaintiff misrepresented to The Travelers Insurance Company that the inspectors suffered various back, neck and shoulder injuries.

65. Finally, the court finds numerous misrepresentations, inaccuracies and false statements in Inspector Schick's testimony before the grand jury. Many of these misrepresentations involve overgeneralizations and statements about all of the suspects that simply were not true in plaintiff's case. The court finds that by making the following statements with respect to *all* of the suspects, Schick misled the grand jury into believing that the statements also applied to plaintiff:

(a) During the initial visit, the inspectors told the attorney that they had not been injured;

(b) The inspectors claimed "no injury at all;"

(c) The inspectors told the attorney that they "wanted to rip off an insurance company" and that they needed a phony medical report; and

(d) All of the suspects had been indexed through the Insurance Crime Prevention Institute Index System.

66. Other false testimony by Schick before the grand jury included information specifically about plaintiff's case. The court finds the following testimony about plaintiff untrue:

(a) Inspector Armstrong and Glick told plaintiff they had not sustained any injuries "but wanted to make a fast buck;"

(b) Inspectors Bush and Glick told plaintiff that Dr. Warren had agreed to back-date their medical reports; and

(c) Plaintiff told Inspector Bush to have a vehicle damage report prepared for a stated amount.

### Conclusions of Law

*I. Subject Matter Jurisdiction.*

1. The United States as sovereign is immune from suit except as it consents to be sued. *United States v. Sherwood,* 312 U.S. 584, 586–87, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941). By enactment of the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.,* Congress waived the government's immunity from suit. Pursuant to 28 U.S.C. § 1346(b), the district courts have exclusive jurisdiction under the Federal Tort Claims Act to hear civil actions for monetary damages against the United States for personal injury caused by the wrongful acts or omissions of a government employee.

2. The district courts do not, however, have jurisdiction under section 1346(b) to hear claims based upon an act or omission

of a government employee exercising or failing to exercise a discretionary function. *See* 28 U.S.C. § 2680(a).

3. In our Memorandum and Order of April 8, 1986, the court dismissed for lack of subject matter jurisdiction plaintiff's claims challenging the planning, preparation and completion of the MAIL fraud investigation because they were barred by this discretionary function exception to the Tort Claims Act. *See Crow v. United States,* 634 F.Supp. 1085, 1089–90 (D.Kan. 1986).

4. In that same memorandum and order, we refused to dismiss for lack of subject matter jurisdiction plaintiff's claims that the Postal Inspectors falsified their memoranda and reports and gave false testimony before the grand jury. *See id.* We held that we had subject matter jurisdiction to hear these claims because (1) the claims fell within a special proviso for certain intentional torts found at 28 U.S.C. § 2680(h) (*see* 634 F.Supp. at 1088); and (2) the inspectors' conduct in falsifying records and giving false testimony did not fall within the discretionary function exception (*see id.* at 1089).

5. Defendant now makes additional arguments that the court lacks subject matter jurisdiction to hear plaintiff's claims. Because a challenge to the court's subject matter jurisdiction is never waived, and may be raised at any time, the court must address defendant's arguments before ruling on the merits of plaintiff's claims. *See* Fed.R.Civ.P. 12(h)(3); 5 Wright & Miller, *Federal Practice and Procedure* § 1393 at 863.

6. First, defendant argues that plaintiff's claims are barred by the discretionary function exception, 28 U.S.C. § 2680(a). Defendant contends that the evidence presented at trial failed to establish that any reports contained false information or that Inspector Schick falsely testified before the grand jury. Defendant argues that the claims made by plaintiff at trial were nothing more than a disguised effort to attack the manner in which the MAIL fraud investigation was carried out.

7. We do not agree with defendant's arguments. As we discussed above in our findings of fact, the Inspectors' memorandum, and Inspector Schick's status reports, presentation letter and testimony before the grand jury contained many inaccuracies and falsehoods. We therefore conclude that plaintiff's claims are not barred by the discretionary function exception.

8. Alternatively, defendant argues that plaintiff's malicious prosecution claim does not fall within the intentional torts proviso found at 28 U.S.C. § 2680(h) and the court is therefore without subject matter jurisdiction to hear this claim.

9. Section 2680(h) of Title 28 of the United States Code provides that the Federal Tort Claims Act shall not apply to:

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

10. We held in our Memorandum and Order of April 8, 1986, that because Postal Inspectors are authorized to serve warrants and make arrests (*see* 39 C.F.R. § 233.1), plaintiff's malicious prosecution claim fell within the special proviso of subsection (h). *See* 634 F.Supp. at 1088. We therefore held that plaintiff's malicious prosecution claim was not barred.

11. Now, for the first time, defendant argues that the proviso of subsection (h) applies only when the alleged tort arises out of a search, seizure or arrest by the

investigative officer. Because plaintiff's malicious prosecution claim did not arise out of a search, seizure or arrest, but rather an investigation, defendant argues that the malicious prosecution claim is barred.

12. Defendant relies on the Third Circuit's decision in *Pooler v. United States*, 787 F.2d 868 (1986), *cert. denied*, — U.S. ——, 107 S.Ct. 175, 93 L.Ed.2d 111 (1987), in support of its argument. According to our research, *Pooler* is the only case to have addressed this issue. The Third Circuit held that to successfully sue the government for an intentional tort under subsection (h), the plaintiff must charge that the investigative officer "committed an intentional tort while executing a search, seizing evidence or making an arrest." *Id.* at 872. Thus, under the court's holding, a claim for assault, battery, false imprisonment, false arrest, abuse of process or malicious prosecution is actionable under the Federal Tort Claims Act only if the claim arises out of a search, seizure or arrest by an investigative officer. The court reasoned:

> We read the 1974 amendment to section 2680(h) as addressing the problem of intentionally tortious conduct occurring in the course of the specified government activities. It is in the course of such activities that government agents come most directly in contact with members of the public. The government places them in such a position, thereby exposing the public to a risk that intentionally tortious conduct may occur. That Congress intended to deal only with conduct in the course of a search, a seizure, or an arrest is confirmed by the sparse legislative history of the 1974 amendment. The Senate Report on the amendment states that the proviso was enacted to provide a remedy against the United States in situations where law enforcement officers conduct "no-knock" raids or otherwise violate the fourth amendment. *See* S.Rep. No. 588, 93d Cong., 2d Sess. 2–3 (1974), *reprinted in* 1974 U.S.Code Cong. & Ad.News 2789, 2790–91.

13. We are not persuaded by the court's reasoning in *Pooler*. We must respectfully decline to accept the Third Circuit's interpretation of subsection (h) on the basis of such a fragmentary indication of Congressional intent. Not only does the Third Circuit's interpretation of the law run counter to the plain meaning of the subsection, it also renders the special proviso for malicious prosecution meaningless. The court can easily understand how an investigative officer can commit assault, battery, false arrest and imprisonment, and possibly even abuse of process, while executing a search, seizing evidence or making an arrest. We are hard-pressed, however, to understand how an officer can commit the acts constituting malicious prosecution while conducting a search or seizure or while making an arrest.

14. It is a well established canon of statutory construction that each part of a statute should be construed in connection with every other part to produce a harmonious whole. *Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). A statute should be interpreted so that effect is given to all of its provisions, so that no part will be inoperative or superfluous. *United States v. Menasche*, 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955). *See, generally,* 2A *Sutherland Statutory Construction* §§ 46.05–46.06 (4th Ed.).

15. It is also well established that the Federal Tort Claims Act's waiver of the government's sovereign immunity should not be extended or narrowed beyond that which Congress intended. *See, e.g., United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 356–57, 62 L.Ed.2d 259 (1979); *Ewell v. United States*, 776 F.2d 246, 248 (10th Cir.1985).

16. Construing section 2680(h) in light of these rules, we hold that it permits a malicious prosecution claim against the government whenever the claim alleges that an investigative officer, acting in his or her investigative or law enforcement capacity, committed acts constituting malicious prosecution. We are confident that Congress never intended to require that the malicious prosecution claim directly

arise out of a search, seizure or arrest by the officer.

17. Because plaintiff's malicious prosecution claim satisfies this test, we hold that the special proviso of section 2680(h) applies here. We therefore conclude that we have subject matter jurisdiction to hear plaintiff's malicious prosecution claim.

18. The court further concludes (and the parties do not dispute) that we have jurisdiction to hear plaintiff's outrage claim under the Federal Tort Claims Act.

## II. *Federal Tort Claims Act.*

1. In order to recover under the Federal Tort Claims Act, plaintiff must establish two elements. First, plaintiff must show that he has suffered personal injury caused by a wrongful act or omission of a government employee acting within the scope of his office or employment. Second, plaintiff must establish that the government employee's act occurred "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). This latter element requires that the law of the place where the alleged wrongful conduct occurred be applied. *Richards v. United States,* 369 U.S. 1, 10, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962).

2. With respect to the first element, the court concludes that the Postal Inspectors were acting within the scope of their employment when they entered the false information in their memorandum and reports and when false testimony was given to the grand jury.

3. With respect to the second element, the court concludes that the law of the State of Kansas applies to plaintiff's malicious prosecution and outrage claims. The court finds that the alleged wrongful conduct of the Postal Inspectors occurred in Kansas because the falsified memorandum, presentation letter and reports containing false information were turned over to the Assistant United States Attorney in Kansas, and the grand jury proceedings and criminal trial of plaintiff took place in Kansas.

## III. *Malicious Prosecution.*

### A. *The Elements and Plaintiff's Evidence.*

1. To maintain an action for malicious prosecution, the plaintiff must prove the following: (1) the defendant instituted the criminal proceeding of which complaint is made; (2) the defendant in so doing acted without probable cause and with malice; (3) the proceeding terminated in favor of the plaintiff; (4) plaintiff sustained damages. *Braun v. Pepper,* 224 Kan. 56, 58, 578 P.2d 695, 698 (1978); *Stohr v. Donahue,* 215 Kan. 528, 530, 527 P.2d 983, 985 (1974); *Thompson v. General Finance Co., Inc.,* 205 Kan. 76, 91, 468 P.2d 269, 282 (1970).

*Institution of the Criminal Proceedings.*

2. To show that a defendant instituted the criminal proceeding, plaintiff must show that the defendant "was affirmatively active in instigating or participating in the prosecution." *Barnes v. Danner,* 169 Kan. 32, 35, 216 P.2d 804, 807 (1950). The defendant "must have been the prosecutor or the actor and moving cause on the prosecution, and he is sufficiently the prosecutor where the action was instituted at his instance and request by a public prosecutor." *Id.* It is not sufficient for plaintiff to show that the defendant had mere passive knowledge or acquiesced in or consented to the acts of the prosecutor. *Id.*

3. In Kansas, as in most jurisdictions, the defendant typically "initiates" a criminal proceeding for purposes of a malicious prosecution claim by signing a criminal complaint against the plaintiff. *See, e.g., Jones v. Zimmerman,* 180 Kan. 701, 703, 308 P.2d 96, 97 (1957); 52 Am.Jur.2d *Malicious Prosecution* §§ 23–24 at 201.

4. Because Kansas state courts do not typically use grand juries to indict suspected criminals as the federal courts do, there is no Kansas case law dealing with the initiation of the criminal proceeding where a grand jury is involved. There is, however, case law from other jurisdictions deal-

**572**

ing with "initiation" within the grand jury context.

5. These cases hold that a defendant does not "initiate" a criminal proceeding merely by testifying falsely before a grand jury. *See Whittaker v. Duke,* 473 F.Supp. 908 (S.D.N.Y.1979); *McClarty v. Bickel,* 155 Ken. 254, 159 S.W. 783 (1913). *See also Restatement (Second) Torts § 655* Comment c. These cases reason that the mere act of testifying does not involve the witness in an active enough role in instituting the criminal proceeding to warrant liability. In *Whittaker,* the court distinguished between witnesses who merely testify falsely before a grand jury and those who take an active part "in instigating or encouraging the prosecution, and directing or aiding the conduct of the case, or in advising or assisting another person to begin the proceeding." 473 F.Supp. at 911. The court recognized that liability should attach to those witnesses who "come forward and present information to the authorities in the absence of a request for such information in the context of an ongoing investigation." *Id.*

■ 6. In the case of Inspector Schick, more is involved than mere false testimony before the grand jury. Inspector Schick took an active part in bringing about the indictment of plaintiff. All of his activities took place in "the context of an ongoing investigation," in which the primary goal was prosecution of the plaintiff, among others. Schick expected the United States Attorney's Office to rely upon his reports and presentation letter in deciding whether to present plaintiff's case to the grand jury. Without a doubt, Inspector Schick's presentation letter to John Martin was intended to aid Martin and to encourage prosecution of plaintiff. The presentation letter not only described plaintiff as a "proposed defendant" and Dr. Warren as his "accomplice," but also listed the different witnesses who would be available to testify against plaintiff, along with their anticipated testimony. In light of these factors, we conclude that Inspector Schick, and thus the government, "instituted" the crim-

inal proceedings against plaintiff for purposes of his malicious prosecution claim.

7. The court, however, does not find that Inspectors Bush and Gillis, merely by writing one memorandum containing false information and by participating in the MAIL fraud investigation, "initiated" the proceedings against plaintiff. These inspectors had a much less active role than Schick in the prosecution of plaintiff and never appeared before the grand jury as Schick did. Furthermore, their memorandum was never presented to the grand jury. Although we certainly do not condone Inspectors Bush and Gillis' conduct in writing a memorandum containing false statements, we do not believe that they actively participated in the prosecution so as to render the government liable in malicious prosecution for their conduct.

8. Additionally, the court concludes that Inspectors Armstrong and Glick, merely by participating in the investigation of plaintiff, did not "initiate" the proceedings against plaintiff. Thus, we hold the government is not liable to plaintiff for malicious prosecution based upon their conduct.

9. Because we conclude that only Inspector Schick initiated the criminal proceedings against plaintiff, the court will confine the remainder of its discussion on plaintiff's malicious prosecution claim to Inspector Schick's conduct.

*Probable Cause.*

10. Probable cause for instituting a proceeding exists "when there is a reasonable ground for suspicion surrounded by circumstances sufficiently strong in themselves to warrant a cautious or prudent [person] in the belief that the party committed the act" of which he is charged. *Nelson v. Miller,* 227 Kan. 271, 277, 607 P.2d 438, 443 (1980).

11. The inquiry as to the existence or lack of probable cause is limited to the facts and circumstances as they appeared at the time the prosecution was commenced. *Id.*

12. As we noted in our earlier memorandum and order in this case, an indict-

ment by a grand jury is generally considered prima facie evidence of the existence of probable cause. *See Crow v. United States,* 634 F.Supp. 1085, 1092 (D.Kan. 1986). When, however, as here, the plaintiff claims that the indictment was obtained through false testimony or records, the indictment is no longer relevant. *Id.*

■ 13. Viewing the conditions apparent at the time plaintiff's prosecution was commenced, we conclude that probable cause did not exist to institute proceedings against plaintiff for mail fraud in violation of 18 U.S.C. § 1341 and § 2 or for inducing travel in interstate commerce in violation of 18 U.S.C. § 2314. A cautious or prudent individual would not find the tape-recorded conversations between plaintiff and the inspectors "reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves" that plaintiff had committed the crimes of which he was charged in the indictment. There is simply no showing, except through convoluted and strained inferences, that plaintiff understood that the Postal Inspectors wanted plaintiff's assistance in defrauding the insurance companies. The tapes and surrounding circumstances establish neither criminal activity nor the plaintiff's intent to engage in criminal activity. Even the Postal Inspectors themselves apparently doubted plaintiff's intent to participate in a fraudulent scheme—Inspector Armstrong testified at trial that he was concerned that if the scheme were too obvious and they told plaintiff that they intended to defraud the insurance companies, plaintiff would refuse to cooperate in the scheme. We agree with Judge Saffels, who in entering a judgment of acquittal in favor of plaintiff, stated that "[o]nly the most unreasonably strained view of the evidence would have pointed to proof of fraudulent intent on [Crow's] part."[1] *United States v. Crow,* No. 81–20074–01 (D.Kan., *unpublished,* Dec. 22, 1981). Thus, we hold that plaintiff has established that the defendant acted without probable cause in instituting the criminal proceedings against him.

*Malice.*

■ 14. Malice for purposes of a malicious prosecution claim is not restricted to personal hatred, revenge or spite by the one who initiates the proceeding. *Nelson v. Miller,* 227 Kan. 271, 278, 607 P.2d 438, 444 (1980). It is sufficient if the action was brought for any improper or wrongful purpose. *Id.* When a criminal proceeding is intentionally instituted with any other motive than to punish crime or to bring criminals to justice, malice is established. *Id.*

15. It is not necessary that the plaintiff prove malice directly. It is well established that malice may be inferred from the lack of probable cause. *Bratton v. Exchange State Bank,* 129 Kan. 82, 86, 281 P. 857, 859 (1929). Malice may also be inferred if the defendant acted in reckless disregard of the plaintiff's rights. 52 Am.Jur.2d *Malicious Prosecution* § 152 at 277.

16. Malice may be shown if the defendant, having instigated or assisted in the criminal prosecution, gave false testimony as a witness in the criminal proceeding. *Id.* § 154 at 279.

■ 17. Certainly, in this case, plaintiff has made no showing that Inspector Schick possessed personal hatred or ill will toward plaintiff or that Schick instituted the proceedings against plaintiff for a wrongful purpose. We do, however, find that plaintiff has established an inference of malice from the following: (1) the lack of probable cause; (2) Inspector Schick's reckless disregard for the truth and plaintiff's rights; and (3) Schick's giving of false testimony before the grand jury and submission of reports and presentation letter to the U.S. Attorney's Office containing inaccuracies and falsehoods.

18. The court believes that this case is a prime example of reckless disregard for the plaintiff's rights. Actual tape recordings of all but one of the conversations

1. We recognize that in so holding, Judge Saffels was viewing the evidence after the government had presented its evidence at plaintiff's criminal trial. Although we must view the evidence at a different time, *i.e.,* when the proceedings were instituted, we still concur with Judge Saffels' opinion of the evidence.

existed in this case. Inspector Schick had a duty to review the tapes before making the specific incriminating statements contained in his reports and before testifying before the grand jury. By making such incriminating statements, knowing that they would be heavily relied upon by the prosecuting attorney and grand jury, Inspector Schick clearly acted in reckless and callous disregard of plaintiff's rights. In light of the foregoing, we must conclude that plaintiff has sufficiently established the existence of malice in this case.

*Termination of the Proceedings.*

19. At plaintiff's criminal trial, a judgment of acquittal was entered in plaintiff's favor at the close of the government's evidence. Without a doubt, such an acquittal constitutes termination of the proceedings in plaintiff's favor. *See* 52 Am.Jur.2d *Malicious Prosecution* § 37 at 209.

*Damages.*

20. The issue of damages has been reserved for separate trial pending the court's decision on liability. However, sufficient evidence was presented at the instant trial on liability for the court to conclude that plaintiff did in fact suffer damages as a result of the defendant's conduct.

21. In sum, the court concludes that plaintiff has established the necessary four elements to sustain a claim of malicious prosecution against the defendant, based upon the conduct of Inspector Schick.

B. *Reliance on the Advice of the Prosecuting Attorney.*

1. Defendant relies on the well established rule that a defendant is not liable for malicious prosecution if he acts upon the advice of a prosecuting attorney. In *Nelson v. Miller*, 227 Kan. 271, 607 P.2d 438 (1980), the Kansas Supreme Court described the defense as follows:

The advice of counsel, as to the institution of a criminal proceeding, sought and acted upon in good faith, will absolve one from damages for malicious prosecution; but only where all the facts known to the informant, and all which can be learned by a diligent effort to acquire information, have been laid before such counsel.

*Id.* at 279, 607 P.2d 438 (emphasis deleted) (citing *Messinger v. Fulton*, 173 Kan. 851, 855, 252 P.2d 904 (1953); *Haines v. Railway Co.*, 108 Kan. 360, 195 P. 592 (1921); *Drake v. Vickery*, 81 Kan. 519, 520, 106 P. 290 (1910); *Railroad Co. v. Brown*, 57 Kan. 785, 48 P. 31 (1897)).

2. The defendant must *truthfully* lay before the prosecuting attorney all the facts of which he has knowledge. *Thompson v. General Finance Co., Inc.*, 205 Kan. 76, 92, 468 P.2d 269, 283 (1970); *Jones v. Zimmerman*, 180 Kan. 701, 703, 308 P.2d 96, 97 (1957); *Rowe v. Glen Elder State Bank*, 132 Kan. 709, 712, 297 P. 703, 705 (1931).

3. All of the Kansas cases dealing with this defense involve the typical situation in which the defendant goes before the prosecuting attorney and discloses all of the facts about the plaintiff's involvement in a suspected crime. The county attorney determines whether the facts disclosed to him are sufficient to charge plaintiff with a crime. After doing so, the attorney advises the defendant that plaintiff's acts do in fact constitute a crime and then directs the defendant to sign a complaint against the plaintiff. *See Jones*, 180 Kan. at 702–03, 308 P.2d at 97; *Haines v. Atchison, Topeka & Santa Fe Railway Co.*, 108 Kan. 360, 365, 195 P. 592, 594 (1921).

4. It is the defendant's good faith reliance on the prosecutor's advice that a crime has been committed and that the defendant should file a complaint against the plaintiff which releases the defendant from all liability from malicious prosecution. The fact that the defendant sought and relied upon the prosecuting attorney's advice establishes that the defendant acted with probable cause in instituting the action and negates the idea that he acted with malice. 52 Am.Jur.2d *Malicious Prosecution* § 87 at 242.

5. The criminal proceeding in this case differs from the typical state case where the defendant discloses information to the prosecuting attorney and is advised to sign a criminal complaint. In the instant case, as in any case involving an indictment

by a grand jury, it is difficult to conceive how the defense is applicable, since the prosecuting attorney does not have occasion to advise complaining witnesses to file charges against a suspect. Defendant argues that in a case such as this, the U.S. Attorney gives his advice "when he decides that a matter should be presented to the grand jury, when he acts as a presentation officer to the grand jury on behalf of the government, and finally when he endorses the grand jury's decision and agrees to exercise his prosecutorial discretion to proceed with the prosecution by signing the indictment."

6. The court is not persuaded by defendant's argument. There was virtually no evidence presented that Inspector Schick sought or relied upon the advice of John Martin as to the institution of criminal proceedings against plaintiff. Although Martin did testify in his deposition that he often gave investigating agents advice concerning the elements of the offense and what would have to be proven in order to successfully prosecute a suspect, we do not believe this alone is sufficient to call into play the defense. At most, the evidence reflects that Martin may have discussed generally with the postal inspectors what elements constitute the offense of mail fraud. There was, however, no evidence that Martin advised the inspectors concerning the particulars of plaintiff's case.

7. Even if we were to hold otherwise, we would nevertheless find the defense inapplicable since the defendant has failed to establish that all of the facts known to Inspector Schick and all which could have been learned by diligent efforts were presented to the Assistant United States Attorney. There is no question in this case that Inspector Schick, in his presentation letter and reports and testimony before the grand jury, did not truthfully state the facts concerning plaintiff's involvement in any crime.

8. Defendant argues that regardless of whether these reports and testimony contained some inaccuracies and falsehoods, Inspector Schick fully and truthfully disclosed all of the facts to Martin because he gave all the tape recordings to him. According to defendant, Martin could have listened to all of the tapes and sought to determine for himself whether their reports were true, thus absolving defendant from all liability.

9. Arguably, if Martin had in fact listened to all of the tapes, defendant should not be held liable. But here, the evidence was quite unclear as to whether Martin had listened to all of the tapes, especially since he apparently did not have a reel-to-reel recorder to play them back. Furthermore, it is unrealistic for Schick to believe that Martin would in fact listen to all of the tapes. This investigation spawned over 240 tape recordings involving more than sixteen defendants. Inspector Schick expected Martin to rely on his reports and letter in deciding what information to present to the grand jury and whether to draft an indictment of the plaintiff (regardless of whether Martin actually did so). Additionally, Schick had to have known that the grand jury would rely on his testimony, especially since he knew that the grand jurors did not listen to all of the tapes.

10. Thus, the court holds that Inspector Schick did not truthfully disclose all of the facts known to him, or those that he could have learned by diligent efforts, to the Assistant United States Attorney in charge of plaintiff's criminal proceedings.

11. In light of the above, the court concludes that defendant has failed to satisfy its burden in establishing that the defense of reliance on the advice of the prosecuting attorney is applicable here. Defendant is therefore liable to plaintiff for malicious prosecution based upon Inspector Schick's conduct.

## IV. *Outrage.*

### A. *The Elements.*

1. Under Kansas law, a plaintiff is required to establish the following four elements to prevail on an outrage claim:

(1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be ex-

treme and outrageous; (3) there must be a causal connection between the defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

*Burgess v. Perdue*, 239 Kan. 473, 475, 721 P.2d 239, 242 (1986).

2. With respect to the second element, the supreme court has stated:

[L]iability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.... Liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, "Outrageous!"

*Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175, 1179 (1981).

3. The Kansas Supreme Court has failed to find outrageous conduct in numerous cases since it first recognized the cause of action in *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P.2d 104 (1974). *See, e.g., Burgess*, 239 Kan. at 477, 721 P.2d at 241–42 (following an unauthorized autopsy, doctor telephoned mother to tell her he had deceased son's brain in a jar); *Chism v. University of Kansas College of Health Sciences*, 237 Kan. 330, 699 P.2d 43 (1985) (student dismissed from medical school after repeated failure of courses); *Neufeldt v. L.R. Foy Const. Co.*, 236 Kan. 664, 693 P.2d 1194 (1985) (woman recovering from miscarriage falsely informed that an arrest warrant had been issued for her husband); *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 662 P.2d 1214 (1983) (hospital informed plaintiffs that their daughter was dead when she was in fact alive and at a different hospital); *Hanrahan v. Horn*, 232 Kan. 531, 657 P.2d 561 (1983) (defendant teacher

told class that plaintiff was suspected of murdering his own son); *Roberts*, 230 Kan. at 295, 637 P.2d at 1177–78 (while plaintiff was on gurney in hospital being prepared for surgery, defendant told plaintiff with hostility that he didn't like her and that he wanted her to know that before she went into the operating room).

4. The emotional distress suffered must be in such extreme degree that "the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts*, 230 Kan. at 293, 637 P.2d at 1179.

5. The distress must be severe, genuine and extreme. Emotional distress includes severe and extreme mental suffering, anguish, and nervous shock, and includes all highly unpleasant mental reactions such as fright, horror, shame, embarrassment, and anger. *Id.* at 294, 637 P.2d at 1180.

6. The extreme distress must be reasonable and justified under the circumstances. No liability attaches where the plaintiff suffers exaggerated or unreasonable distress, unless it results from a peculiar sensitivity of which the defendant had knowledge. *Id.*

7. In determining whether a plaintiff has suffered severe distress, the court may consider whether the plaintiff received psychiatric or medical treatment and whether the plaintiff was able to function in a normal way after the accident. *See id.* at 296; 637 P.2d at 1181.

**B.** *The Evidence.*

1. As we discussed above in part I of this opinion, the discretionary function exception to the Federal Tort Claims Act precludes us from ruling on whether the manner in which the Postal Inspectors carried out the investigation amounted to extreme and outrageous conduct.[2] The only issue before us is whether the government is liable under the tort of outrage for the

---

**2.** The Tenth Circuit, in *United States v. Gamble*, 737 F.2d 853 (10th Cir.1984), a criminal case involving another defendant targeted by the same MAIL fraud investigation, strongly criticized the investigation. Noting that the investigation unwittingly involved the assistance of

judges, prosecutors, state licensing authorities and insurance companies, the Tenth Circuit stated: "The government agents in the case before us displayed shocking disregard for the legal system." *Id.* at 858.

Postal Inspectors' writing of reports containing inaccuracies and falsehoods and Inspector Schick's giving of false testimony before the grand jury.

 2. Plaintiff argues persuasively that the lies of the Postal Inspectors, the attitude with which they delivered their lies and their total lack of respect for the grand jury and other judicial processes, constituted extreme and outrageous conduct. We find that we need not resolve this extremely difficult issue, since we conclude that plaintiff has failed to establish one of the other elements necessary to prevail on his outrage claim, that of severe emotional distress.

3. The only evidence presented at trial concerning the distress plaintiff suffered was that plaintiff found the indictment and subsequent trial "devastating." Plaintiff testified that the experience of being booked, fingerprinted and photographed was "traumatic." He also testified that the had to call his parents to inform them of the indictment to prevent them from hearing the news over the radio or television. Plaintiff presented no other evidence as to the extent of his distress. While the court can certainly conceive that a person falsely charged with a crime and forced to stand trial might suffer extreme distress, trauma and humiliation, there is simply no evidence of it occurring here. Plaintiff presented no evidence that psychological or medical treatment was sought or that he suffered any long-term distress resulting from the defendant's conduct. Certainly, no evidence was presented that plaintiff suffered any distress so extreme "that no reasonable person should be expected to endure it."

4. In light of the above, the court concludes that defendant is not liable to plaintiff under the tort of outrage.

IT IS THEREFORE ORDERED that judgment be entered in favor of the plaintiff, Donald L. Crow, on plaintiff's malicious prosecution claim and entered in favor of the defendant, United States of America, on plaintiff's outrage claim. A trial on the issue of damages will be scheduled at a later date.